175 P.3d 709

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Faa P. FETELEE, Petitioner/Defendant–Appellant.**

No. 27482.

Supreme Court of Hawai'i.

Jan. 31, 2008.

Ronette Kawakami (Taryn R. Tomasa, on the application), Deputy Public Defenders, for petitioner/defendant-appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

On August 29, 2007, this court accepted a timely application for a writ of certiorari, filed by petitioner/defendant-appellant Faa P. Fetelee on July 17, 2007, requesting that this court review the May 17, 2007 judgment of the Intermediate Court of Appeals (ICA), entered pursuant to its April 18, 2007 published opinion in *State v. Fetelee*, 114 Hawai'i 151, 157 P.3d 590 (App.2007). Therein, the ICA affirmed the Circuit Court of the First Circuit's [1] August 3, 2005 judgment of conviction and sentence. Following a jury trial, Fetelee was convicted of: (1) attempted murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) §§ 705–500 (1993), 707–701.5 (1993), and 706–656 (1993 & Supp.2006); (2) attempted assault in the second degree, in violation of HRS §§ 705–500, 707–711(1)(a) (1993); and (3) theft in the fourth degree, in violation of HRS § 708–833 (1993).

Briefly stated, during the early morning hours of June 8, 2003, Fetelee became involved in three incidents that occurred in and around his apartment building located near the Waimalu Zippy's restaurant in 'Aiea, Hawai'i. The first incident in the chain of events occurred in one of the apartments in the building, but did not result in any charges against Fetelee [hereinafter, the apartment incident]. The second incident occurred in the parking lot of Fetelee's apartment building where Fetelee came upon a woman from whom he stole ten dollars and was charged with theft. The third incident involved Fetelee's confrontation of two Micronesian men who were walking down the street fronting Fetelee's apartment building. As a result, Fetelee was charged with attempted murder for repeatedly stabbing one of the males and with assault for punching and kicking unconscious the other male. One of the focal points of this case involves the admission of the events that occurred during the apartment incident as part of the *res gestae*[2] of the charged offenses.

In his application, Fetelee essentially contends that the ICA committed grave error in acknowledging the common law *res gestae* doctrine as an exception as to Hawai'i Rules of Evidence (HRE) Rule 404(b) (Supp.2006) (governing evidence of other crimes, wrongs, or acts), quoted *infra*, to allow otherwise inadmissible evidence, *i.e.*, the apartment incident, into the record. Specifically, Fetelee argues that the ICA erred in holding that: (1) the apartment incident was part of the *res gestae* of the charged offenses; (2) the apartment incident was admissible as a *res gestae* exception to HRE Rule 404(b); (3) the trial court did not abuse its discretion in allowing respondent/plaintiff-appellee State of Hawai'i (the prosecution) to reopen its case-in-chief to adduce evidence of the apartment incident; and (4) the trial court's failure to give a limiting instruction *prior to* admitting testimony regarding the apartment incident did not constitute error. Oral argument before the supreme court was held on December 6, 2007.

As discussed more fully *infra*, we adopt the view that the use of *"res gestae"* as an independent basis for the admission of evidence should be abandoned in the wake of Hawaii's well-developed and long-standing rules of evidence. In light of our pronouncement today, we are compelled to vacate the ICA's May 17, 2007 judgment on appeal and the trial court's August 3, 2005 judgment of conviction and sentence, and remand the case to the trial court for a new trial consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

As previously stated, Fetelee became involved in a series of events during the early morning hours of June 8, 2003. The facts

---

1. The Honorable Michael D. Wilson presided over the underlying trial and sentencing proceedings.

2. The term *res gestae* is defined as "[t]he events at issue, or other events contemporaneous with them." Black's Law Dictionary 1335 (8th ed.2004).

surrounding each of these events as related by the ICA in its opinion are essentially unchallenged; thus, the background information is gleaned therefrom. Moreover, inasmuch as the issues raised by Fetelee in his application center around the *res gestae* evidence and the reopening of the prosecution's case-in-chief, the recounting of the testimony of the relevant witnesses has been similarly limited in scope for such purposes.

Angela Lopez, who lived in the same apartment building as Fetelee, testified that,

> prior to June 8, 2003, Fetelee had visited her apartment to talk to her sister. On the night of June 7 into the early morning hours of June 8, 2003, Lopez was in the living room of her apartment with her friends, Tony, Eddie Freeman (Freeman), and Josh. Fetelee knocked on Lopez's door and opened the door before she got to it. Fetelee initially asked Lopez whether she could get him any drugs. Lopez recalled that Fetelee was intoxicated and had an "angry kind of voice." She testified that Fetelee was saying "what what" to Tony, her sister's boyfriend, like he was "in a way calling out" Tony. Fetelee came into her apartment, picked up a fan, and threw it straight up at the ceiling. Fetelee's throwing of the fan caused the fan to become unplugged from the wall, which, in turn, caused the lights in the apartment to go out. Lopez testified that Fetelee then "went after" Freeman and, even though it was "kind of dark," it looked like Fetelee punched Freeman. She testified that[,] after Fetelee attacked Freeman, Freeman and Josh ran out the back door. Fetelee chased Tony out of the apartment to the neighbor's apartment upstairs. Lopez stated that Fetelee returned later, apologized, and then left.

*Fetelee*, 114 Hawai'i at 153, 157 P.3d at 592. When asked whether Fetelee appeared "calm" when he returned to apologize, Lopez responded in the affirmative. Lopez further indicated that she was unsure as to how much time had passed between the apartment incident and Fetelee's apology; she testified, however, that "it was like maybe ten minutes, less than ten—it was—it was very short period of time."

As will be explained more fully *infra* regarding the circumstances of his testimony, Freeman testified that,

> in the early morning hours of June 8, 2003, he was in Lopez's apartment. Fetelee came to the door of the apartment and nicely asked Lopez if someone could move the van that was blocking his parking space. Lopez went upstairs, talked to the people upstairs, and came back in the apartment. The people upstairs did not move the van, and Fetelee came back, pounded on Lopez's apartment door, and then entered the apartment. Fetelee was becoming angry because he had to go somewhere. Lopez started yelling at Fetelee for pounding on the door, and then Fetelee began yelling at everyone. Freeman observed that Fetelee was drunk and "just kind of mad." Fetelee was standing right next to Freeman when Fetelee threw the fan and the electricity went off. When the lights·went out, Freeman remained seated. Freeman testified that he then felt something that he thought was a fist hit him on the right side of his jaw area. Freeman identified Fetelee as the person who hit him. Freeman ran out of the apartment and retreated to a gas station down the street, where he talked to one of his friends for a few minutes. When Freeman returned to the apartment, he noticed the police and the ambulance. Freeman estimated that roughly ten minutes had elapsed between the time Fetelee hit him and the time he returned to the apartment.

*Id.* at 154, 157 P.3d at 593.

After leaving the apartment building, Fetelee came upon Kuulei Lincoln in the parking lot area of the apartment building. In describing that encounter, Lincoln testified that,

> in the early morning hours of June 8, 2003, she was walking to Lopez's apartment when she met Fetelee in the driveway in front of the apartment building where Fetelee's and Lopez's apartments were located. She stated that[,] from his body motions and the way he called to her, Fetelee "looked angry." Fetelee asked Lincoln if she had a cigarette and any money. Lincoln answered "no" as to the money. As

Lincoln pulled out her cigarette pack, a ten dollar bill came out, and Fetelee grabbed the bill. Lincoln testified that she did not ask for the money back because she did not want to create a hassle.

Lincoln testified that[,] as she and Fetelee were talking, two Micronesian boys [ (later identified as Michael Hartman and his cousin, Kenter Alik) ] walked by them. Lincoln testified that Fetelee was still angry and began yelling at the boys, "What, you think you guys tough?" The two boys did not say anything—they just shook their heads "no." Fetelee then hit [Hartman] twice in the face, and [Hartman] fell to the ground. [Alik] was trying to help [Hartman] out of the middle of the road when Fetelee hit [Alik] with his hand. Fetelee ran upstairs to his apartment and returned with a fanny pack. Fetelee pulled a knife from his fanny pack and stabbed [Alik]. Fetelee proceeded to rifle through the backpack of one of the Micronesians. Lincoln testified that at no time did she observe the two Micronesian boys say or do anything to make Fetelee angry.

*Id.* at 155, 157 P.3d at 594. According to Alik,[3] he and Hartman had taken the bus to 'Aiea from McKinley Car Wash, where they worked, arriving at around 1:30 to 2:30 a.m. on June 8, 2003.

As the two men walked from the bus stop, Alik noticed two people, Fetelee and a woman, in the parking lot. near Fetelee's apartment building.

Alik testified that he was walking ahead of Hartman. He heard Fetelee say "You're a tough guy," and[,] when Alik looked back, he saw Fetelee hit Hartman and Hartman fall to the ground. After Hartman was on the ground, Fetelee kicked Hartman in the face. Alik thought Hartman was dead because Hartman did not move and there was blood coming out of his nose. Alik ran to help Hartman and

a fight ensued between Alik and Fetelee. Neither of the men were successful in hitting or kicking the other. Alik took off his backpack, hit Fetelee with it, and then acted like he was going to pull something out of the backpack. At this point, Fetelee ran towards his apartment building.

Alik began to pull Hartman across the street towards their house, but Hartman became too heavy to pull. Fetelee returned with a small black bag. Alik dropped Hartman, took off his backpack, and hit Fetelee with the backpack. Fetelee pulled a knife from the black bag. Alik testified that he tried to run, but Fetelee caught him and stabbed him once in his side and once in his stomach. Alik tried to run again, but he fell, and Fetelee stabbed him behind his right ear. Alik went to his apartment and called his cousins to come help Hartman, who was still lying on the street. Alik testified that he remembered losing consciousness in the ambulance and not regaining it until one month later in the hospital. He testified that at no time while he was walking home did he threaten Fetelee or challenge Fetelee to a fight.

*Id.* at 154–55, 157 P.3d at 593–94. Several other witnesses testified for the prosecution;[4] however, their testimony is inconsequential for purposes of Fetelee's application.

In his defense, Fetelee called David B. Clark, who witnessed the altercation between Fetelee and the Micronesian men. Clark testified that, in the early morning of June 8, 2003, he was riding his bike while looking for his wife who had not come home. Clark observed Fetelee arguing with two Micronesians. Clark witnessed Fetelee strike one of the Micronesians, who dropped to the ground. Clark rode away, continuing to search for his wife. At some point, Clark turned around and came back in the direction of Fetelee. According to Clark, one of the Micronesians was swinging a backpack at Fetelee. When Fetelee yanked the back-

---

3. Alik testified with the assistance of a Chuukese interpreter.

4. The other witnesses who testified for the prosecution included: (1) Hartman; (2) Alik's sister, Naxima Alik; (3) Mary Takemori, the manager of Waimalu Zippy's who observed the crime scene

immediately following the incident; (4) Thomas O'Callaghan, M.D., a surgeon at Queen's Medical Center who treated Alik and Hartman on June 8, 2003; and (5) Honolulu Police Department Officer Neal Murakami, who had responded to the incident.

pack, a knife came out. Clark testified that the man tried to poke Fetelee with the knife and Fetelee grabbed the man's arm and neck. Clark indicated that, as a result of the struggle between the man and Fetelee over the knife, the man was stabbed. Clark, however, stated that he did not see a knife in Fetelee's hand.

Clark testified that he was arrested and put in jail the next day for an unrelated reason. While Clark was incarcerated, he saw Fetelee at O'ahu Community Correctional Center and heard that he was "there for killing someone at Zippy's[.]" He testified that "I seen what took place and to me, that's not—I mean that's not right." Clark told Fetelee, "If you need me, I going to the Salvation Army. If you need me for your stuff, have your attorney whatever, fine with me. That's where I'll be."

Fetelee testified in his own defense, stating, *inter alia*, that

he returned home to find three cars parked in the parking lot. He went to Lopez's apartment at around 11:30 p.m. or 12:00 midnight and told Lopez to tell whoever ow[n]ed one of the . . . cars to move it so that his girlfriend could park her van. He testified that he was "all drunk already" when he entered Lopez's apartment. He went upstairs, and when he came back down, no one had moved the car and the police were about to ticket the van. He went back to Lopez's apartment and pounded on the door. Fetelee went in the apartment to find out who owned the car; he told the people in the apartment to move the car before he "bust up" the car. Fetelee denied challenging anyone in the apartment to a fight or threatening to kill anyone there. He testified that he was upset, but not mad. He testified that he "went move up the fan and it hit the roof," but he "never try hurt anybody." He denied that he punched Freeman; he stated that when he turned around in the hallway, "his side went hit" Freeman. He testified that he "walked," not ran, after Tony. Fetelee went upstairs to his apartment, past the apartment where Tony was, and then about five to ten minutes later returned to Lopez's apartment to apologize. He testi-

fied that he told Lopez he was "sorry about the incident," he never meant to do that, and he "was only mad." He went back to his apartment for about ten minutes, drank a beer, and then went outside to the parking lot area. At this point, Fetelee came into contact first with Lincoln and then the two Micronesian men. *Fetelee*, 114 Hawai'i at 157, 157 P.3d at 596 (original brackets omitted). Fetelee stated that he

saw [Lincoln] across the street, and I call[ed Lincoln] for come. Then she came. I ask[ed Lincoln] if I can have one cigarette[ ]. So she g[a]ve me one cigarette[ ].

 . . . .

. . . And I ask[ed] for one lighter, and I li[t] the cigarette[ ]; and that's when I turn[ed] around, and I [saw] the two [Micronesian] guys.

When asked whether he saw "anything like a ten-dollar bill sticking out of her pocket or on the ground or anything like that," Fetelee answered in the negative, stating "I never see anything." Fetelee again reiterated on cross-examination that he never asked Lincoln for any money nor did he ever see any money sticking out of her pocket or on the ground.

Fetelee then proceeded to relate his encounter with the two Micronesian men. He explained that he first approached the two Micronesian men because he thought they were the same two "Micronesian guys [that] always bother—bother [his then-girlfriend] when she go [to the] store." Fetelee recounted that, when he saw the two Micronesians, he

went call them up. I told them, eh, what you guys think you guys bad, ah? You guys think you all that, ah? And then they just standing over there and looking at me. And the other guy[, *i.e.*, Hartman,] was trying [to] say something.

 . . . .

[Hartman] was trying to talk, but I told him straight up. I told him, you know, I don't understand what you trying to say. And then [Alik] was try[ing to] tell me, no, no, no, wasn't us. And then I come close, and I understand, and I tell him what?

[Alik] said wasn't us, we don't know nothing. And right there, I told him for real, you telling me the truth? And then he say okay, yes. Then I shake his hand. I told him I'm so sorry. So I shake his hand.

. . . .

... I told [Alik], oh—I tell him, oh, I so sorry for stopping you guys like this. And then when I look like this, [Hartman] was right behind me. And when I turn, he move. So I was thinking to my mind this guy going to punch me. So that's why I went turn around and then I punch [Hartman].

I hit [Hartman]. When he went fall down, he stay down. And I just stand over there. I never like kick him. I never like do anything. I just stay stand over there because I see he so small and so tiny so I never like bust him up. So I see him lying down, and I just stay over there. I hear somebody was saying, eh, he[, i.e., Alik,] reaching inside his bag, he reaching inside his bag. So I turn around, and I see [Alik].

. . . .

I turn and [Alik]—because this thing happen and the guy[, i.e., Hartman,] was still lying down. When I was turning around, [Hartman] was try[ing to] sit up. And no more time for me for walk around him. I just went accident run over him, and then I run straight to my—my—my apartment.

Fetelee stated that he ran into his apartment because

I was kind of worry about the guy was reaching inside his bag. So I was thinking to run to the apartment and get my CD—or my radio outside my house and my CD back—only my CD bag. Get CD inside.

. . . .

I went [into my apartment], dump all the CD was inside the bag. Then I came back with the bag for—I was thinking for—just for make them thinking like I have something. But when—when I came down, I see them cross the street already.

. . . .

When I saw them across the street and I walk over there, I said what you going pull out your bag? And then I—I never reach to the guy, and he[, i.e., Alik,] was trying [to] swing [his] bag at me already. But—

. . . .

When [Alik] look at me, then he start swinging the bag at me. And the first swing went hit the CD bag that I had. The CD—it's the CD bag that I had. It went dropping. When I was looking at him and he try to swing again but it like he holding the bag like this. I never know what is inside the bag, nothing. When he was try[ing to] swing again and right there, I grab the bag and I pull the bag away from him. When I was pulling the bag away from him and I see the knife, he holding the knife on his hand. The he started swinging at me like two times like that, and I was jumping up. Was kind of look stupid because one big guy was jumping over this guy[, i.e., Hartman]. So I end up jumping over this guy. I never know what happen. Nothing happen until I jump back and the knife went fall down and he run. And that's why I look, wow. And then I walk away. I grab my CD bag, and then I walk away.

Fetelee further testified that he "never try hurt anybody. All I do, me and him—all I did was try defen[d] myself, and I never know that I hurting him."

## B. *Procedural History*

On June 23, 2003, the prosecution charged Fetelee, via a three-count complaint, with attempted murder in the second degree, attempted assault in the second degree, and theft in the second degree, in violation of HRS § 708–831(1)(a) (1993 & Supp.2004). Trial was scheduled to commence on April 21, 2005.

### 1. Motions in Limine

Prior to trial, both Fetelee and the prosecution filed motions in limine.

Fetelee moved the [trial] court to exclude from use at trial, *inter alia*, testimonial or documentary evidence relating to (1) any other "bad acts" involving Fetelee and (2) any unfavorable evidence against Fetelee that might not technically be considered

"bad acts" under HRE [Rule] 404[ (b) ], [5] but that should be excluded as irrelevant under HRE [Rule] 402 or as unfairly prejudicial under HRE [Rule] 403. The [prosecution] sought, *inter alia*, a ruling from the [trial] court

> ... admitting evidence that Fetelee returned to his residence and became enraged when he found a vehicle blocking the driveway. Fetelee forcibly entered the apartment of ... Lopez and confronted ... Freeman regarding the parked vehicle; Fetelee punched Freeman and left the apartment. While Fetelee was still angry he confronted ... Lincoln, demanded money from her and removed a ten dollar bill from her pocket without permission.... Fetelee's attention was drawn to ... Hartman and ... Alik[.] Evidence regarding Fetelee's conduct toward Freeman is relevant to prove state of mind, motive, and intent. HRE Rules 401, 402, 403.

*Fetelee*, 114 Hawai'i at 153, 157 P.3d at 592 (original brackets omitted).

On April 19, 2005, the trial court held a hearing on the motions, at which time, the prosecution called Lopez as a witness. In addition to the testimony previously recounted, Lopez additionally testified that

> she did not become aware of the incident [involving Alik and Hartman] that occurred in the early morning hours of June 8, 2003 outside her apartment until she walked outside in the early morning. She estimated that it "was hours" between the time Fetelee left her apartment and the time of that incident, but she was not sure how many hours.

*Id.* (footnote omitted). As stated by the ICA in its opinion:

> The [prosecution] contended the incident in Lopez's apartment should be admitted to prove Fetelee's intent, state of mind,

opportunity, and motive. The [prosecution] argued that[,] while Lopez appeared to have "some failure of recollection" regarding the "time element," the charged incidents had occurred no more than ten minutes after the incident in Lopez's apartment—while Fetelee was still angry and upset. The [prosecution] advised the [trial] court that a witness (Freeman) had indicated that the charged offenses occurred right after the incident in Lopez's apartment and the [prosecution] planned to have Freeman testify. The [prosecution] asked the [trial] court to take the matter under advisement until it could locate Freeman. The [trial] court reserved ruling on the issue until Freeman had been located and given an opportunity to testify. *Id.* at 153–54, 157 P.3d at 592–93.

## 2. Trial Proceedings

A five-day jury trial commenced on April 21, 2005. On April 22, 2005, the prosecution rested without the trial court having ruled on the motions in limine. Defense counsel moved for judgment of acquittal, which the trial court denied. Thereafter, the defense called Clark as a witness.

However, before the conclusion of Clark's testimony, the prosecution informed the trial court that it had located Freeman and requested that the trial proceedings be suspended in order to continue the hearing on the motions in limine.

## 3. Continued Hearing on Motions in Limine

Outside the presence of the jury, the trial court heard the testimony of Freeman, discussed *supra*. Thereafter, the trial court ruled:

> It's the judgment of the court that there is sufficient evidence for a reasonable juror to conclude that within a time period of as

---

5. HRE Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

short as three minutes before Mr. Fetelee's contact with Ms. Lincoln, he was angry and intoxicated and that he was angry and intoxicated while engaging in assaultive behavior at Ms. Lopez's apartment. **Accordingly, [the apartment incident] was sufficiently coincident with the alleged offenses as to constitute the *res gestae* of the alleged offenses.** Though the incident does not constitute a prior bad act, it is noted that its relevance does include an explanation of [Fetelee]'s motive, that is, to manifest the anger he continued to experience as a result of the incident in Ms. Lopez's apartment. With respect to [HRE] Rule 403, while the evidence is admittedly prejudicial, it is of significant probative value to core matters of proof required by the prosecution. For these reasons, [Fetelee]'s motion in limine to exclude evidence of the defendant's conduct in Ms. Lopez's apartment is denied.

*Fetelee,* 114 Hawai'i at 154, 157 P.3d at 593 (emphasis added).

As will be discussed more fully *infra,* the prosecution, following the trial court's ruling on Fetelee's motion in limine, orally moved to reopen its case-in-chief to allow Freeman to testify regarding the apartment incident. Defense counsel objected, however, and alternatively argued that, should the trial court grant the motion, the defense would like an opportunity to recall Lopez. The trial court granted the prosecution's motion to reopen, permitting the testimony of Freeman and further examination of Lopez regarding the apartment incident.

#### 4. Continued Jury Trial Proceedings

When trial resumed, Clark was allowed to finish testifying in Fetelee's defense. Thereafter, the prosecution called both Freeman and Lopez, whose testimony was substantially the same as their testimony pursuant to the motions in limine, discussed *supra.*[6] At the conclusion of Lopez's testimony, the prosecution again rested. Defense counsel renewed Fetelee's motion for judgment of acquittal, which the trial court denied.

#### 5. Jury Instructions

After the close of the evidence, the trial court instructed the jury on April 26, 2005. With respect to the apartment incident, the trial court instructed the jury:

> You have heard evidence regarding an incident which allegedly occurred at Angela Lopez's apartment. You must not use this evidence to determine that the defendant is a person of bad character and, therefore, must have committed the offenses charged in this case. Such evidence may be considered by you only on the issue of [Fetelee]'s state of mind, motive, opportunity, and intent, and for no other purpose.

Fetelee did not request the trial court to instruct the jury with a limiting instruction prior to either Freeman's and/or Lopez's testimony regarding the apartment incident.

#### 6. The Jury's Verdicts

On April 27, 2005, the jury returned verdicts, finding Fetelee guilty of attempted murder in the second degree and attempted assault in the second degree; however, on the charge of theft in second degree, the jury found Fetelee guilty of the included offense of theft in the fourth degree. The trial court's judgment of conviction and sentence was entered on August 3, 2005. Fetelee was sentenced to, *inter alia,* a term of life imprisonment with the possibility of parole. On September 2, 2005, Fetelee filed his notice of appeal.

#### C. *Appeal Before the ICA*

On appeal before the ICA, Fetelee argued that the trial court erred in admitting evidence of the apartment incident. Specifically, Fetelee maintained that: (1) "the trial court erred in finding that the [apartment] 'incident ... was sufficiently coincident with the alleged offenses as to constitute [part of] the *res gestae* of the alleged offenses,'" (original brackets omitted); (2) the "evidence constituted 'other crimes, wrongs or acts' committed by Fetelee and was subject to ex-

---

6. However, as the ICA indicated, although Freeman testified at the hearing on the motions in limine that Fetelee hit him with his fist, "Freeman testified [at trial] that he was hit by a fist, but did not know if it was Fetelee who hit him." *Fetelee,* 114 Hawai'i at 154, 157 P.3d at 593.

clusion under HRE [Rule] 404[(b),]"; and (3) the evidence was neither relevant nor probative of the underlying charges and should have been excluded pursuant to HRE Rules 402 and 403. Fetelee also argued that the trial court abused its discretion in allowing the prosecution to reopen its case. Finally, Fetelee contended, for the first time on appeal, that (although a limiting instruction was included as part of the charge to the jury) the trial court erred in failing to give a limiting instruction immediately prior to Freeman's and Lopez's trial testimonies regarding the apartment incident.

In its April 18, 2007 published opinion, the ICA affirmed the trial court's judgment of conviction and sentence. *Fetelee*, 114 Hawai'i at 160, 157 P.3d at 599. First, the ICA concluded that "[t]he [trial] court properly admitted evidence of the [apartment] incident ... as part of the *res gestae* of the charged offenses," *id.*, at 156, 157 P.3d at 595 (emphasis omitted), because the apartment incident, "the exchange with Lincoln, and the unprovoked assault on the two Micronesian men were reasonably contemporaneous with one another[,]" *id.* at 157, 157 P.3d at 596. Second, the ICA concluded that "[t]here is a *res gestae* exception to HRE Rule 404(b)[,]" *id.*, and such exception was satisfied in this case because the apartment incident (1) "is linked to the crimes charged[,]" *id.* at 159, 157 P.3d at 598, (2) "is relevant to provide the jury with an explanation as to why Fetelee was so angry and agitated[,]" *id.*, and (3) "is evidence that was necessary to complete the story for the jury." *Id.* Third, the ICA concluded that the trial court did not abuse its discretion in allowing the prosecution to reopen its case. *Id.* at 159–60, 157 P.3d at 598–99. Finally, the ICA concluded that "[t]he [trial] court did not commit plain error in failing to instruct the jury, prior to the trial testimony of Lopez and Freeman, on the limited purpose of their testimony." *Id.* at 160, 157 P.3d at 599 (emphasis omitted).

The ICA entered its judgment on appeal on May 17, 2007. Fetelee filed his applica-

tion for a writ of certiorari on July 17, 2007. Thereafter, this court accepted Fetelee's application on August 29, 2007. In accepting his application, this court ordered the parties to submit supplemental briefs addressing the following issues:

(1) Whether the *res gestae* doctrine maintains any viability in the wake of the Hawai'i Rules of Evidence (HRE); and

(2) if so, whether *res gestae* evidence is subject to the HRE Rule 403 balancing test. [7]

On October 3, 2007, Fetelee and the prosecution filed their respective supplemental briefs, which are discussed *infra* as they become relevant to the particular issue. As previously stated, this court heard oral argument on December 6, 2007.

## II. STANDARD OF REVIEW

■ The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).

> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Id.* at 246–47, 925 P.2d at 814–15 (citations omitted).

> "Prior bad act" evidence under [HRE] Rule 404(b) ... is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 (1993)[, quoted *infra*,] is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 ... is re-

---

7. HRE Rule 403 (1993) provides that:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

viewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

*State v. Torres,* 85 Hawai'i 417, 421, 945 P.2d 849, 853 (App.1997) (footnotes[, internal quotation marks, and citations] omitted).

*State v. Cordeiro,* 99 Hawai'i 390, 403–04, 56 P.3d 692, 705–06 (2002).

### III. *DISCUSSION*

In his application, Fetelee advances, essentially, three errors committed by the ICA [8] that, in his view, have the "cumulative effect" of depriving him of a fair trial under article I, section 5 of the Hawai'i Constitution, as well as the fifth, sixth, and fourteenth amendments to the United States Constitution. Specifically, Fetelee argues that the ICA incorrectly determined that: (1) the apartment incident constituted *res gestae* evidence and was, therefore, admissible as an exception to HRE Rule 404(b), which rule generally prohibits the admission of evidence of other crimes, wrongs, or acts; (2) the trial court properly granted the prosecution's request to reopen its case-in-chief; and (3) the failure of the trial court to give a limiting instruction to the jury *prior to* the testimony concerning the apartment incident was not error. Fetelee's first contention is dispositive of his application.

### A. *Res Gestae Doctrine and Exception to HRE Rule 404(b)*

As stated above, Fetelee maintains that the ICA erroneously concluded that the apartment incident constituted *res gestae* evidence and that, therefore, such evidence was admissible as an exception to HRE Rule 404(b). Before delving into the correctness of the ICA's conclusions, we first examine the history and meaning of the *res gestae* doctrine, including its development and treat-ment in Hawai'i, as well as in the jurisprudence of other states.

### 1. *Res Gestae* Doctrine and Hawai'i Case Law

Historically, *i.e.,* prior to the codification of the rules of evidence,[9] *res gestae* was understood as an evidentiary principle, which was employed as one of the exceptions to the hearsay rule:

The term *res gestae* seems to have come into common usage in discussions of admissibility of statements accompanying material acts or situations in the early 1800s. *At this time, the theory of hearsay was not well developed, and the various exceptions to the hearsay rule were not clearly defined. In this context, the phrase res gestae served as a convenient vehicle to escape from the hearsay rule in two primary situations.* First, it was used to explain the admissibility of statements that were not hearsay at all. Second, it was used to justify the admissibility of statements that today come within the three exceptions . . .: (1) statements of present sense impressions[;] (2) excited utterances[;] and (3) statements of present bodily condition, mental states, and emotions.

Initially, the term *res gestae* was employed to denote words that accompanied the principal litigated fact, such as the murder, collision, or trespass. However, usage developed to the point where the phrase seemed to embody the notion that evidence of any relevant act or condition might also bring in the words that accompanied it. Two main policies or motives are discernible in this recognition of *res gestae* as a password for the admission of otherwise inadmissible evidence. One is a desire to permit each witness to tell his or her story in a natural way by reciting all that happened at the time of the narrated incident, including those details that give it life and color. Events occur as a seamless web, and the naturalness with which the

---

8. As previously stated, Fetelee raises four arguments in his application. However, inasmuch as two of his arguments relate to the admissibility of the apartment incident under the *res gestae* doctrine, they are addressed as a single contention.

9. The Hawai'i Rules of Evidence were codified in 1981. *See* 1980 Haw. Sess. L. Act 164, § 19 at 274 ("This Act shall take effect on January 1, 1981.").

details fit together gives confirmation to the witness' entire account. The other policy ... is the recognition of spontaneity as the source of special trustworthiness. This quality of spontaneity characterizes to some degree nearly all the types of statements which have been labeled *res gestae*.

2 Kenneth S. Broun, *et. al., McCormick on Evidence* § 268 at 245–46 (6th ed.2006) (emphasis added) (footnotes omitted). Although the concept of *res gestae* generally has been associated with spontaneous declarations,

> [i]n some states, *res gestae* is given an even broader scope to include not only a spontaneous utterance made before, during, or after the commission of a crime, but also real or demonstrative evidence relevant to the crime charged, such as a torn dress of a prosecutrix to show that she had been raped; testimony by a police officer or other witness as to what he heard or observed before, during, or after the commission of the crime; all that occurred at the time and place of the crime, or immediately before or after the crime if causally related thereto; a declaration of intent by the victim; a statement, confession, or admission by the defendant; or a declaration or conduct of a coconspirator or accomplice.

*State v. Hansen,* 296 Mont. 282, 989 P.2d 338, 353 (1999) (quoting 2 Charles E. Torcia, *Wharton's Criminal Evidence* § 288 at 220 (14th ed.1986)). Stated differently, *res gestae* generally refers to the circumstances, facts, and declarations that grow out of the main fact and serve to illustrate its character and that are so spontaneous and contemporaneous with the main fact as to exclude the idea of deliberation or fabrication. As one court succinctly recited:

> The *res gestae* rule was originally evolved, no doubt, in good faith and for a salutory purpose; being confined to things done and statements made, in fact spontaneous, so as to be, in truth as well as in fiction, an integral part of the transaction in litigation, or to be a necessary incident of the criminal act itself involved or to form in conjunction with it one continuous transaction[.]

*Williams v. State,* 188 So.2d 320, 323 (Fla. Dist.Ct.App.1966) (citations omitted).

Consistent with the foregoing, this court has broadly applied the *res gestae* doctrine long before the 1981 codification of the HRE as a basis for the admission of evidence—in most instances, to overcome hearsay objections to contemporaneous statements. For example, in *Nawelo v. Von Hamm–Young Co.,* 21 Haw. 644 (1913), this court held that a statement made by the chauffeur shortly after the subject accident was properly admitted into evidence as a part of the *res gestae. Id.* at 647. The court reasoned that the statement

> was made at the spot where the accident occurred immediately after it had happened and in the presence of the injured party. A declaration to be part of the *res gestae* need not be strictly contemporaneous with the transaction or event to which it relates; it is enough that it was a spontaneous utterance engendered by the excitement of the main event made immediately after and under the influence of the occurrence and so connected with it as to characterize or explain it.

*Id.* at 647–48 (citations omitted); *see also Anduha v. County of Maui, Territory of Hawai'i,* 30 Haw. 44, 50 (1927) (permitting the plaintiff to testify to a statement made by the driver of the defendant's car, which statement was made at the place of the accident and shortly thereafter). Similarly, in *Territory v. Kinoshita,* 38 Haw. 335 (1949), this court held that a child's statements to her mother, although made two and a half hours after the event, were admissible as spontaneous declarations, explaining that:

> [T]he element relating to the time when such statements were made is but one of the factors entering into the determination as to whether declarations were "spontaneous," "natural," "impulsive," "instinctive," "generated by an excited feeling which extends without let or breakdown from the moment of the event they illustrate."

*Id.* at 342 (footnote omitted). *But see Territory v. Warren,* 35 Haw. 232, 238–39 (1939) (in prosecuting for killing of a police officer, evidence that the defendant was operating house of prostitution admissible as *res ges-*

*tae* ); *Territory v. Wilson*, 26 Haw. 360, 361 (1922) (evidence of similar crime committed at the same time and same place admissible as *res gestae* ); *Republic v. Tsunikichi*, 11 Haw. 341, 344 (1898) (evidence that the defendant killed his child prior to killing his wife was admissible as *res gestae* evidence of the charged offense, *i.e.*, the killing of wife).

However, it was not until 1953 when this court, in *Territory v. Lewis*, 39 Haw. 635 (1953), elaborated upon the term *"res gestae,"* defining it as

> those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculating policy of actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act.

*Id.* at 639 (internal quotation marks omitted); *see also Fetelee*, 114 Hawai'i at 156–57, 157 P.3d at 595–96 (quoting *Lewis'* definition of *res gestae* ). In *Lewis*, the defendant was charged with the offenses of assault and battery with intent to disfigure another for striking "the victim at intervals varying from thirty minutes to one and one-half hours" over the course of eight hours. *Lewis*, 39 Haw. at 636, 638. During trial, the trial court admitted into evidence, under the theory of *res gestae*, a statement made by the defendant to a police officer immediately after the police officer gained entry into the defendant's apartment.[10] *Id.* at 638–39. The defendant was convicted of the charged offenses, and he appealed. *Id.* at 636. This court affirmed the convictions, concluding, *inter alia*, that the defendant's statements to the police officer were admissible as part of the *res gestae* because such statements were "made under the exciting influence of said events, reasonably contemporaneous thereto and without prior opportunity for deliberation or manufacture." *Id.* at 640. In so concluding, the *Lewis* court emphasized that

> the close connection in time between the statements or declaration and the act of which it is said to be a part is an element for consideration; that being close in point of time is not, however, all of the basis for receiving such evidence, and that the ultimate test is spontaneity or instinctiveness and logical relations to the main event[.]

*Id.* (internal quotation marks and citation omitted); *see also Fetelee*, 114 Hawai'i at 157, 157 P.3d at 596. In other words, the "sound rule," according to *Lewis*, is that,

> in order for statements to be admitted as part of the *res gestae*, the statements must be reasonably contemporaneous with the event to which they relate, *i.e.*, they must be such as to have been proximately caused by the exciting influence of the event without opportunity for deliberation or influence.

*Lewis*, 39 Haw. at 640 (citation omitted).

As previously noted, the HRE became effective on January 1, 1981 and codified several of the exceptions that had developed in our courts to the general prohibition against the admission of evidence based on hearsay. *See* HRE Rule 100 cmt. (1993) ("The purpose of this chapter is to codify the law of evidence,

---

**10.** Specifically, the police officer testified that, after entering the apartment,

> "I asked him[, *i.e.*, the defendant,] how come [the victim] was in the condition that she was, and he said he only gave her a couple of one-twos, and he made his fist in a swinging manner. He said, 'I also gave her a couple of these.' He was standing—I mean sitting in the chair—and he said he gave her a couple of these. He said, 'Nobody will want to look at her after this.' That was all. I told him immediately then that he was under arrest."

*Id.* at 639.

to promote informed judicial rulings on evidence points, and to achieve uniformity in the treatment of evidence among the courts of this State."). Consequently, the codification of the hearsay exceptions made possible more precise analysis and terminology in decisions related to the admissibility of evidence challenged as hearsay. Thus, the question arises whether the *res gestae* doctrine, post-codification of the HRE, remains viable.

In 1996, this court reexamined *Lewis* in the context of excited utterance. Specifically, this court recited that

> [t]he rule formulated in *Lewis* requires that *the event and the statement be "reasonably contemporaneous" and defines that term* not as a bright-line time limit, but *in terms of the causative link between the event and the statement.* **In other words, the statement is "reasonably contemporaneous" with the event if it was a spontaneous reaction to the exciting event rather than by deliberation or other influence.**

*State v. Moore,* 82 Hawai'i 202, 220, 921 P.2d 122, 140 (1996) (emphases added). The *Moore* court observed that the evolution of the excited utterance exception essentially began with the *Lewis* rule. This court recognized that, through the years, the *Lewis* rule had been "misunderstood" and eventually utilized as authority for the proposition that "the time span between the event and the making of the statement [must be] short-very short." *Id.* (quoting *State v. Messamore,* 2 Haw.App. 643, 649, 639 P.2d 413, 418 (1982)) (internal quotation marks omitted). The *Moore* court further acknowledged that this court, three years after the *Messamore* case was decided, transformed the observation in *Messamore* "into a foundational requirement for the applicability of the excited utterance exception." *Moore,* 82 Hawai'i at 220, 921 P.2d at 140 (citing *Shea v. City & County of Honolulu,* 67 Haw. 499, 692 P.2d 1158 (1985)). Eventually, in 1988, this court, in *In re Doe, born on November 23, 1970* [hereinafter, *In re Doe*], 70 Haw. 32, 761 P.2d 299 (1988), combined the original rule in *Lewis* with the *Shea* time span requirement into factors for the excited utterance exception.

*Moore,* 82 Hawai'i at 220, 921 P.2d at 140. The *Moore* court, however, abrogated *In re Doe* and concluded that "a 'very short' time interval between a startling event and an excited utterance, although a factor in the determination, is not a foundational prerequisite to the admissibility of the statement under HRE Rule 803(b)(2)." *Moore,* 82 Hawai'i at 221, 921 P.2d at 141. Consequently, it appears that the *res gestae* doctrine—as more aptly stated by one court—"has been subsumed within the exceptions to the hearsay rule found in Rule 803, such as excited utterances, statements describing mental or physical conditions, and statements for purposes of medical diagnosis or treatment." *Horton v. State,* 764 P.2d 674, 677 (Wyo.1988) (citation omitted); *see also Jano v. State,* 510 So.2d 615, 616 (Fla.Dist.Ct.App.1987) (observing that the spontaneous statement and excited utterance exceptions contained in the Florida's rules of evidence "encompass evidence frequently considered under what was referred to as the *res gestae* exception" prior to the adoption of the rules of evidence) (citations omitted), *approved,* 524 So.2d 660, 661 (Fla.1988) ("The excited utterance exception is not a new theory of Florida evidence but rather one of a group of exceptions subsumed under the old term of res gestae." (Internal quotation marks and citations omitted.)); *Dawson v. Commonwealth,* 867 S.W.2d 493, 495 (Ky.Ct.App.1993) (the excited utterance exception "grew out of the doctrine of '*res gestae*'"). Nevertheless, the question whether the *res gestae* doctrine maintains any viability in the wake of the rules of evidence has been the subject of much controversy, as demonstrated below.

### 2. Recognition of the Res Gestae Doctrine in Other States

Initially, we observe that commentators have repeatedly urged that the *res gestae* doctrine be abandoned because of its vagueness and imprecision. Indeed, as the ICA in an earlier opinion noted:

> [C]ommentators and, with ever greater frequency, courts have criticized the use of the phrase *res gestae* for its vagueness, imprecision, and limited application. McCormick [on Evidence] notes that[,] although, historically, the phrase has served

its purpose, "the law has now reached a stage where expanding admissibility will be best accomplished by other means." *State v. Connally*, 79 Hawai'i 123, 126 n. 5, 899 P.2d 406, 409 n. 5 (App.1995) (original brackets and internal citations omitted) (quoting 2 John W. Strong, *McCormick on Evidence* § 268 at 196 (4th ed.1992) (also stating that the "ancient phrase can be jettisoned, with due acknowledgment that it served an era in the evolution of evidence law")). Specifically, commentators criticized that the *res gestae* doctrine's

> vagueness and imprecision are apparent.... [T]raditional limitations on the doctrine, such as the requirement that it be used only in regard to the principal litigated fact and the frequent insistence of concurrence (or at least a close relationship in time) between the words and the act or situation, have restricted its usefulness as a tool for avoiding unjustified application of the hearsay rule. However, the vagueness of the phrase also made it easier for courts to broaden its coverage and thus permitted the admissibility of certain statements in new situations. The ancient phrase thus played a role in the evolution of evidence law and the expansion of the admission of contemporaneously made hearsay statements.

2 Broun, *McCormick on Evidence* § 268 at 246. Another commentator observed that *res gestae* "has had various uses. But it is ambiguous and unmanageable in all of them. The doctrines to which it has been applied possess, all of them, a right of existence under well-recognized preexisting principles and can be explained without a resort to this phrase." 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1767 at 253 (Chadbourn rev.1976). Moreover,

> [t]he phrase *res gestae* has long been not only entirely useless, but even positively harmful. It is useless[ ] because every rule of evidence to which it has ever been applied exists as part of some other well-established principle and can be explained in the terms of that principle. It is harmful[ ] because[,] by its ambiguity[,] it invites the confusion of one rule with another and thus creates uncertainty as to the

limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology. No rule of evidence can be created or applied by the mere muttering of a shibboleth. There are words enough to describe the rules of evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision.

*Id.* at 255 (footnote omitted).

Numerous courts, adopting the approach suggested by commentators, began to abolish the *res gestae* doctrine as an independent basis for admissibility of evidence. *See, e.g., Stephens v. Miller*, 13 F.3d 998, 1003 (7th Cir.1994) (observing that, for purposes of Federal Rules of Evidence (FRE), the use of the term *res gestae* "is essentially obsolete" and citing to federal court cases that described the phrase *res gestae* as "useless, harmful, and almost inescapable [sic] of a definition"); *People v. Dennis*, 181 Ill.2d 87, 229 Ill.Dec. 552, 692 N.E.2d 325 (1998) ("Illinois has abandoned the concept of *res gestae* as amorphous, having been applied indiscriminately and inhibiting any reasonable analysis." (Citations omitted.)); *State v. Gunby*, 282 Kan. 39, 144 P.3d 647, 663 (2006) (holding that the doctrine of *res gestae* is no longer a basis for admission of evidence); *State v. Hafford*, 410 A.2d 219, 220–21 (Me.1980) (continued use of the term *res gestae* inappropriate under Maine law); *Bynote v. Nat'l Super Markets, Inc.*, 891 S.W.2d 117, 121 (Mo.1995) (holding Missouri "will no longer recognize the phrase '*res gestae*' as carrying sufficient meaning to support either the admission of or an objection to proffered testimony"); *State v. Hansen*, 296 Mont. 282, 989 P.2d 338, 354 (1999) ("The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented."); *Horton v. State*, 764 P.2d 674, 677 (Wyo.1988) (Although acknowledging that "the concepts that traditionally were labeled as '*res gestae*' are still present in the law of evidence, the phrase itself no longer is present under the Wyoming Rules of Evidence. Given the

adoption of the Wyoming Rules of Evidence, it probably is more helpful for courts and counsel to address evidentiary issues in the language of those rules."); *see also State v. Long*, 173 N.J. 138, 801 A.2d 221, 239–40 (2002) (Stein, J., concurring in part and dissenting in part) (collecting federal and state cases that have expressed disapproval of the continued reference to *res gestae* in evidence law).

*Res gestae*, however, has continued to be utilized by other courts as a viable concept, descriptive of the continuous nature of a criminal offense and an exception to Rule 404(b). *See United States v. Hardy*, 228 F.3d 745, 748 (6th Cir.2000) (explaining that *res gestae* evidence "does not implicate Rule 404(b)"); *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir.1992) ("A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." (Citations omitted.)); *United States v. McDaniel*, 574 F.2d 1224, 1227 (5th Cir.1978) ("Evidence of other crimes, closely related in both time and nature to the crime charged, may be admitted to establish the *res gestae*, that is, the common scheme or history of the crime, of which the other crimes constitute a part." (Internal quotation marks and citation omitted.)); *Collins v. State*, 304 Ark. 587, 804 S.W.2d 680, 682 (1991); *People v. Rollins*, 892 P.2d 866, 872–73 (Colo.1995); *People v. Quintana*, 882 P.2d 1366, 1373–74 (Colo.1994); *People v. Robinson*, 128 Mich.App. 338, 340 N.W.2d 303, 304 (1983); *State v. Pasek*, 691 N.W.2d 301, 309

(S.D.2004); *State v. Elmore*, 139 Wash.2d 250, 985 P.2d 289, 311 (1999).[11]

To further complicate matters and as correctly pointed out by the prosecution in its supplemental brief, courts that have not expressly recognized the *res gestae* doctrine implicitly acknowledged its continued viability via the application of its underlying concept—though the terminology employed may differ. In *United States v. Green*, 175 F.3d 822 (10th Cir.1999), the United States Court of Appeals for the Tenth Circuit explained that Rule 404(b) applies only to evidence of acts extrinsic to the crime charged: "Direct or intrinsic evidence of the crime charged does not fall within the ambit of the rule." *Id.* at 831 (citation omitted).[12] Most courts have denominated evidence as intrinsic

> if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of [sic] trial.

*United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983) (per curiam) (citations omitted); *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir.2006) (holding that "[e]vidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred[,]" *i.e.*, that "the other crimes evidence completes the story or provides a total picture of the charged crime") (internal quotation marks and citation omitted); *United States v. Williams*, 900 F.2d 823, 825 (5th

---

**11.** As discussed more fully *infra*, the ICA relied upon *Quintana, Robinson, Pasek,* and *Elmore* to support its conclusion that *res gestae* is an exception to HRE Rule 404(b). *See Fetelee*, 114 Hawai'i at 157–59, 157 P.3d at 596–598.

**12.** An examination of the cases reveals that the so-called "intrinsic" evidence is usually introduced in conspiracy cases:

> In a conspiracy case, "acts committed in furtherance of the charged conspiracy are themselves part of the act charged." *United States v. Garcia Abrego*, 141 F.3d 142, 175 (5th Cir. 1998). Evidence of such acts is therefore intrinsic and simply does not implicate the requirements of [Rule] 404(b). *See id.; United States v. Badru*, 97 F.3d 1471, 1475 (D.C.Cir.

1996) (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedures* § 5239, at 450 (1978)) ("In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused."); *United States v. Sasser*, 971 F.2d 470, 479 (10th Cir.1992) (affirming that direct evidence of the charged conspiracy was not 404(b) evidence and therefore did not require a limiting instruction on evidence of "other acts").

*Green,* 175 F.3d at 831 (original brackets and ellipsis omitted).

Cir.1990) (same); *see also United States v. Krezdorn*, 639 F.2d 1327, 1332 (5th Cir.1981) (observing that evidence that completes the story or that is inextricably intertwined with the charged offense is sometimes labeled *res gestae*, "an appellation that tends merely to obscure the analysis underlying the admissibility of the evidence").[13]

▮ Nevertheless, a number of courts have raised concerns regarding the application of the intrinsic/extrinsic analysis to bypass the prohibition against allowing other "bad acts" to prove character. As one court observed:

> We note that there [are] no significant costs to requiring a Rule 404(b) analysis; all the prosecution must do is establish a not-for-character purpose for the bad acts evidence, and give pretrial notice[.] Nor does avoiding Rule 404(b) absolve the [c]ourt of the duty, upon request, to provide a limiting instruction. Therefore, we suggest that Rule 404(b) should apply to all specific bad acts proffered by the prosecution, unless such acts occurred in the time period covered by the indictment and are substantively related to the charges.

*Ameri*, 297 F.Supp.2d at 1169 (quoting Stephen A. Slazburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* § 404.02 (8th ed.2002)) (format altered). The *Ameri* court, thus, stated that "courts should be very chary of admitting 'bad act' evidence if it does not pass muster under Rule 404(b)." *Id.*

Another court has gone even further, questioning the notion that there should even be an exception to Rule 404(b) for acts that are "inextricably intertwined" with charged offenses. In *United States v. Bowie*, 232 F.3d 923 (D.C.Cir.2000), counterfeit money that led to the charges was discovered on May 16, 1997, when a joint Federal Bureau of Investigation/Metropolitan Police Department narcotic tasks force executed a search warrant at a Washington, D.C. apartment where the defendant resided. *Id.* at 925. An officer outside the apartment noticed a man sitting in the passenger seat of a parked vehicle;

the officer engaged in a conversation with the man, who consented to a search of the car and indicated that the car belonged to the defendant. *Id.* The defendant denied owning the car. *Id.* A search of the car revealed more than $3,000 of counterfeit twenty and fifty dollar bills and a traffic ticket issued ten days earlier with the defendant's name and license number of the car on it. *Id.* Because none of the defendant's fingerprints were found on the bills, the prosecution sought to introduce evidence of the defendant's earlier arrest (on April 17, 1997) for possession of counterfeit money. *Id.* at 926. The trial court overruled the defendant's Rule 404(b) objection to the introduction of the April 17, 1997 evidence, holding that Rule 404(b) did not apply because the acts were inextricably intertwined with the charged crime. *Id.* at 926–27. The United States Court of Appeals for the District Court of Columbia, however, criticized the "inextricably intertwined" analysis as an unnecessary limitation on the exclusionary language of Rule 404(b):

> As a practical matter, it is hard to see what function this interpretation of Rule 404(b) performs. If the so-called "intrinsic" act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). The rule bars bad acts evidence only when the evidence is offered solely to "prove the character of a person in order to show action in conformity therewith." [FRE] Rule 404(b). Evidence that constitutes the very crime being prosecuted is not of that sort. So far as we can tell, the only consequences of labeling evidence "intrinsic" are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request. *See* [FRE Rule] 404(b) advisory committee's note on the 1991 amendment (indicating that the notice requirement does not apply to "intrinsic" evidence); [FRE Rule] 105 (mandating, upon request, limiting instruction for multi-purpose evidence)[.]

---

13. The United States District Court for the Eastern District of Arkansas, in *United States v. Ameri*, 297 F.Supp.2d 1168 (E.D.Ark.2004), observed that "[e]very circuit now applies some formulation of the inextricably intertwined test." *Id.* at 1171 (collecting cases from all circuits).

*Id.* at 927. The court also questioned whether the distinction between intrinsic and extrinsic facts was workable:

> Bifurcating the universe into intrinsic and extrinsic evidence has proven difficult in practice. Which of a defendant's acts should be considered the charged crime and which should not is often uncertain. In order to brighten the line separating intrinsic and extrinsic evidence, many courts have focused on the connection between a given crime or act and the charged crime. When evidence is "inextricably intertwined" with the charged crime, courts typically treat it as the same crime. Every circuit now applies some formulation of the inextricably intertwined "test."

*Id.* at 927–28 (collection of cases from other circuits and internal footnotes omitted). The court concluded that, not only is the line between intrinsic and extrinsic evidence difficult to draw, but that there is a danger when trial courts seek to find the line:

> [T]reating evidence as inextricably intertwined not only bypasses Rule 404(b) and its attendant notice requirement, but also carries the implicit finding that the evidence is admissible for all purposes notwithstanding its bearing on character, thus eliminating the defense's entitlement, upon request, to a jury instruction. There is, as well, a danger that finding evidence "inextricably intertwined" may too easily slip from analysis to mere conclusion. What does the "inextricably intertwined" concept entail? When is a defendant's crime or act so indistinguishable from the charged crime that an item of evidence is entirely removed from Rule 404(b)?
>
> We have not defined "inextricably intertwined" in the few Rule 404(b) cases in which we used those terms. Our sister circuits have attempted various formulations. The Seventh Circuit, for instance, examines "whether the evidence is properly admitted to provide the jury with a complete story of the crime on trial, whether its absence would create a chrono-

logical or conceptual void in the story of the crime or whether it is 'so blended or connected' that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." *United States v. Hughes,* 213 F.3d 323, 329 (7th Cir.2000)....

> We do not find these formulations particularly helpful. Some are circular: inextricably intertwined evidence is intrinsic, and evidence is intrinsic if it is inextricably intertwined. Others are over-broad. The "complete the story" definition of "inextricably intertwined" threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could "complete the story" or "incidentally involve" the charged offense, or "explain the circumstances." If the prosecution's evidence did not "explain" or "incidentally involve" the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant. *See* [FRE Rules] 401 and 402.

*Id.* at 928 (citations omitted). The court further observed that

> the fact that omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether. Moreover, evidence necessary to complete a story—for instance by furnishing a motive or establishing identity—typically has a non-propensity purpose and is admissible under Rule 404(b).

*Id.* at 929.

> The *Bowie* court ultimately concluded that there is no general "complete the story" or "explain the circumstances" exception to Rule 404(b) in this [c]ircuit. Such broad exclusions have no discernible grounding in the "other crimes, wrongs, or acts" language of the rule. Rule 404(b), and particularly its notice requirement, should not be disregarded on such a flimsy basis.

*Id.* at 929.[14] To demonstrate its concerns, the court turned to the *Bowie* facts and

> Rule 404(b), for instance, would not have barred testimony from a witness who saw [the defendant] put the counterfeit currency in the [vehicle]'s console. Although such testimony

---

14. The *Bowie* court, nonetheless, legitimately recognized that, in a "narrow range" of cases, a bad act can be so close in time and space as to be part of the charged crime.

concluded that the trial court was incorrect in concluding that the April 17, 1997 evidence was inextricably intertwined with the May 16, 1997 charged offense, reasoning that "we do not see how [the defendant's] acts on April 17 constituted the same crime as that charged in the indictment. The authorities seized the counterfeit bills he had in possession on April 17, so the bills he possessed on May 16 could not have been the same ones." *Id.* Nevertheless, the *Bowie* court concluded that the trial court properly admitted the evidence of the April 17, 1997 incident to show the defendant's *intent and knowledge:*

> To convict [the defendant] under 18 U.S.C. § 472, the [prosecution] had to prove three elements: possession of counterfeit notes, intent to defraud, and knowledge the notes were counterfeit. Intent and knowledge were therefore facts of consequence to the case. Evidence that [the defendant] possessed and passed counterfeit notes on a prior occasion was relevant because it decreased the likelihood that [the defendant] accidentally or innocently possessed the counterfeit notes on May 16. Intent and knowledge are also well-established non-propensity purposes for admitting evidence of prior crimes or acts.

*Id.* at 930.[15]

Similarly, in *United States v. Cross*, 308 F.3d 308 (3d Cir.2002), the United States Court of Appeals for the Third Circuit (the Third Circuit) declined the prosecution's invitation to adopt either the "inextricably intertwined" doctrine or the "complete the story" doctrine, calling them, respectively, "a definition that elucidates little" and "a definition so broad that it renders 404(b) meaningless." *Id.* at 320. Instead, the Third Circuit insisted on a significantly closer connection for exemption from Rule 404(b)—rather than "intertwined," evidence must "directly prove the charged [offense]" to escape the rule. *Id.* Cross was a conspiracy case; the defendants, who were state court personnel [hereinafter, the appellants], were charged with conspiring to violate Pennsylvania citizens' right to a fair and impartial trial in connection with a scheme to "fix" state-court cases. *Id.* at 310. There was evidence that the appellants engineered guilty verdicts; however, there was also evidence that they conspired to fix some cases in defendants' favor, which evidence the government argued should be exempt from Rule 404(b) on the grounds that the evidence "completed the story" of the appellants' crimes. *Id.* at 311–12. The Third Circuit held that this latter evidence did "not directly prove" the charged offense, and, thus, Rule 404(b) applied:

> [The a]ppellants' acts pertaining to the favorable disposition cases do not directly prove their conspiracy to violate Pennsylvania citizens' right to a fair and impartial

---

relates to one of defendant's acts, the act is the charged crime of possessing counterfeit currency. In other words, if the evidence is of an act that is part of the charged offense, it is properly considered intrinsic. In addition, some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.

*Id.* at 929. Interestingly, it appears that the United States Court of Appeals for the District Court of Columbia continues to acknowledge the admission of intrinsic evidence as falling outside of Rule 404(b). Indeed, in *United States v. Gooch*, 514 F.Supp.2d 63 (D.D.C.2007), the court stated, "*Bowie* continue[d] to recognize that uncharged bad acts may be 'intrinsic' and thereby admissible without a Rule 404(b) analysis if the acts were 'part of the charged offense' or if they were 'contemporaneous' and 'they facilitated the commission of the charged crime." *Id.* at 69–70 (citation omitted).

**15.** In *United States v. Senffner*, 280 F.3d 755 (7th Cir.2002), the United States Court of Appeals for the Seventh Circuit declined to follow *Bowie's* conclusion that there is no general "complete the story" or "explain the circumstances" exception to Rule 404(b), reasoning that:

> Evidence of acts that are joined with the crime itself ... occupy a different stature by nature. That these acts share a relationship with and connection to the crime (even in a broad sense) significantly restricts the ability of the government to offer bad acts by the defendant, which is consistent with the historical and legislative purpose of Rule 404(b). It also sufficiently removes those acts from the language of the *per se* proscription in Rule 404(b), which only prohibits "other" bad acts.

280 F.3d at 764–65 (citations omitted). The court further observed that

> the doctrine itself is already a narrow one, and any perceived over-inclusiveness in the doctrine as we define it is inconsequential, because Rule 403 (like Rule 404(b)) protects against the unnecessarily prejudicial presentation of barely probative evidence.

*Id.* at 765.

hearing in the to be-found-guilty cases, and thus by any definition are not intrinsic to the [charged] offense. In a trial limited to the [violation of citizens' civil rights], [the a]ppellants would be charged only with conspiring to engineer guilty verdicts, not with conspiring to fix cases generally. While the evidence pertaining to the favorable disposition cases helps prove [the a]ppellants' broader conspiracy to fix cases, it does not directly prove that [the a]ppellants conspired to get defendants found guilty.

*Id.* at 320.

In another case, *People v. Agado*, 964 P.2d 565 (Colo.Ct.App.1998), the defendant was charged and convicted of second degree murder of his girlfriend's male friend. *Id.* at 566. The court applied the *res gestae* doctrine to admit evidence of an argument between the defendant and his girlfriend on the night before the murder. *Id.* at 567. Although concurring in the result, Colorado appellate court judge Briggs wrote separately to express his concern and caution with excluding evidence denominated as *res gestae* from the requirement of Rule 404(b):

The risk of surprise is not my only concern with continuing to forego compliance with the requirements of [Rule] 404(b) merely because evidence is denominated as *res gestae*. For example, no limiting instruction is required for evidence of other acts admitted as *res gestae*. However, the importance of giving a limiting instruction, particularly when the other acts were not substantially simultaneous in time and circumstances, is no less than when the evidence is admitted under [Rule] 404(b). While not mentioned in more recent cases, the supreme court has noted that, even with *res gestae* evidence, it is the better practice to instruct the jury regarding the limited purpose of the evidence at the time it is admitted.

In addition, evidence of another act is sometimes admitted merely because it falls within the definition of *res gestae*, even though it could easily be excised. The limitation under [Rule] 403 that *res gestae* evidence should not be admitted if its probative value is "substantially outweighed"

by the risk of prejudice or confusion has not always provided sufficient protection from misuse of the doctrine.

Finally, the very concept of *res gestae* can be problematic. In Colorado, the term has not been consistently defined, and, more generally, the doctrine has confounded counsel and courts, often tending to create as much confusion as clarification. Even when the term is uniformly defined, it is difficult analytically to keep the determination of whether evidence is relevant distinct from whether it is part of the *res gestae*. For example, in this case, the evidence in question had independent relevance to show the intermediate inference of motive, as well as the ultimate inference of intent, and was therefore admissible under [Rule] 404(b), but that has no bearing on whether the evidence was part of the *res gestae* of the crime.

*Id.* at 569–70 (internal quotation marks, citations, and original brackets and ellipsis omitted). Judge Briggs further suggested a resolution that

<u>all</u> evidence of **other** acts, including "intrinsic" <u>res gestae</u> evidence as well as other "extrinsic" evidence, be subject to the requirements of [Rule] 404(b). Such an approach is even more appropriate now that the "clear and convincing" standard previously applied under the common law for admitting evidence of other acts has been replaced under our rules of evidence by the lower "preponderance" standard.

*Id.* at 570 (underscored emphasis in original) (bold emphasis added) (citation omitted). However, in the meantime, Judge Briggs cautioned against the use of *res gestae* such that "the exception does not swallow the rule," urging the trial courts to continue to apply Rule 403 balancing test. *Id.*

Against this historical backdrop upon which our rules of evidence have arisen and upon which courts remain conflicted, we turn now to the case at hand, examining: (1) the arguments raised by Fetelee in his direct appeal, the ICA's opinion, and Fetelee's arguments on application, including the parties' supplemental briefs, elaborating on the viability of the *res gestae* doctrine; and (2) whether the application of the *res gestae*

doctrine remains viable in this jurisdiction in the wake of the HRE.

### 3. The Instant Case: The *Res Gestae* Challenge

#### a. *arguments before the ICA*

As previously stated, Fetelee was convicted of attempted murder in the second degree, attempted assault in the second degree, and theft in the fourth degree, which convictions Fetelee appealed. On appeal, Fetelee essentially maintained that the trial court erred in characterizing the apartment incident as *res gestae* evidence and, therefore, "the incident [did] not constitute a prior bad act" under HRE 404(b). Fetelee specifically argued that:

> [S]ince the codification of HRE in 1981, there is no indication that Hawai'i courts have intended to expand the *res gestae* doctrine, *i.e.*, the codification of the common law hearsay exception, to include an exception to wrongs, crimes or other acts encompassed under HRE [Rule] 404. [16]

Consequently, Fetelee believed that Rule 404(b) governed the admissibility of the apartment incident, and, because the apartment incident was "distinct" from the charged offenses, such evidence constituted other bad act "propensity" evidence and was inadmissible. Fetelee also maintained that, even if relevant, the evidence of the apartment incident was not admissible under HRE Rule 403 inasmuch as "any probative value was substantially outweighed by [the] danger of unfair prejudice and [was] likely [to] rouse[ ] the jury to overmastering hostility against [him]."

In response, the prosecution asserted that the proffered evidence was properly admitted as part of the *res gestae* of the charged offenses, observing that:

> While no Hawai'i appellate court may have recognized *res gestae* evidence to be an exception to HRE Rule 404(b) ..., five federal circuits recognize such an exception to the rule's federal counterpart. *See United States v. Baker*, 432 F.3d 1189, 1205 n. 9 (11th Cir.2005) (*res gestae* evi-

dence falls outside scope of [the Federal Rules of Evidence (FRE) Rule] 404(b)); *United States v. Martinez*, 430 F.3d 317, 335 (6th Cir.2005) ("background" or "*res gestae* " evidence does not implicate FRE [Rule] 404(b)); *United States v. Roberts*, 253 F.3d 1131, 1135 (8th Cir.2001) (district court did not abuse its discretion in admitting *res gestae*, non-FRE [Rule] 404(b) evidence); *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir.1995) (evidence admissible for one of the purposes specified in FRE [Rule] 404(b) and *res gestae* evidence not always separated by bright line)[.] ... The [prosecution] submits that Hawai'i courts should follow the five federal circuits and adopt a similar *res gestae* exception to HRE Rule 404(b)[.]

The prosecution, alternatively, argued that, even assuming arguendo that the apartment incident constituted HRE Rule 404(b) evidence, *i.e.*, evidence of other bad acts, the trial court properly admitted the evidence because the "[e]vidence that [Fetelee] was angry, drunk, and violent just before coming into contact with Lincoln, Hartman, and Alik was relevant to show [Fetelee]'s state of mind, motive, and intent." The prosecution further stated that the probative value of the apartment incident was not substantially outweighed by the danger of unfair prejudice:

> There ... existed a significant need for the evidence.... [E]vidence of the incident was necessary to provide context to the charged offenses and was probative of [Fetelee]'s state of mind, motive, and intent. The incident explained why [Fetelee] would attack two complete strangers for no apparent reason and refute his claims of self-defense and lack of intent. Moreover, there was no effective alternative of proving the incident other than by having Freeman and Lopez testify.
>
> [T]he probability of the evidence rousing the jury to overmastering hostility was not significant. Most jurors could understand why [Fetelee] became angry when no one moved the vehicle that was blocking his parking space. Furthermore, any undue prejudice was mitigated by the [trial]

---

**16.** Fetelee also pointed out that, in *Moore*, this court "recently construed *res gestae* as a codified exception to the hearsay rule recognized under common law."

court's limiting instruction as to the use of the evidence.

### b. *the ICA's holding*

As previously stated, the ICA issued its published opinion on April 18, 2007, affirming Fetelee's convictions. *Fetelee*, 114 Hawai'i at 152–53, 157 P.3d at 591–92. Therein, the ICA rejected Fetelee's contentions and concluded that the trial court correctly categorized the apartment incident as part of the *res gestae* of the charged offenses, thereby, rendering the evidence admissible as an exception to HRE Rule 404(b). *Id.* at 156–59, 157 P.3d at 595–98.

In concluding that the apartment incident constituted *res gestae* evidence, the ICA relied upon the *Lewis* definition of *res gestae* and its rule that the ultimate test is "spontaneity or instinctiveness and logical relation to the main event." *Id.* at 157, 157 P.3d 590, 157 P.3d at 596 (quoting *Lewis*, 39 Haw. at 640) (internal quotation marks omitted). As the *Lewis* court stated,

> in order for statements to be admitted as part of the *res gestae*, the statements must be *reasonably contemporaneous with the event to which they relate, i.e.,* **they must be such as to have been proximately caused by the exciting influence of the event without opportunity for deliberation or influence.**

*Lewis*, 39 Haw. at 640 (emphases added) (citation omitted). Based upon the foregoing, the ICA explained that:

> In the instant case, the [trial] court properly admitted the evidence of the [apartment] incident . . . as part of the *res gestae* of the incident in question. . . .
>
> In total, Fetelee was agitated when he arrived home to find his parking stall blocked and his agitation, coupled with his intoxication, continued throughout the course of the early morning. *The incident in Lopez's apartment, the exchange with Lincoln, and the unprovoked assault on the two Micronesian men were reasonably contemporaneous with one another.*

*Fetelee*, 114 Hawai'i at 157, 157 P.3d at 596 (emphasis added). Subsequently, the ICA, in concluding that *res gestae* evidence was admissible as an exception to HRE Rule 404(b), initially observed that, "[b]ecause our appellate courts have not addressed a *res gestae* exception to Rule 404(b), we look to other jurisdictions for guidance." *Id.* at 157, 157 P.3d at 596. Specifically, the ICA discussed four out-of-state cases, to wit: (1) *State v. Elmore*, 139 Wash.2d 250, 985 P.2d 289 (1999); (2) *People v. Robinson*, 128 Mich. App. 338, 340 N.W.2d 303 (1983); (3) *State v. Pasek*, 691 N.W.2d 301 (S.D.2004); and (4) *People v. Quintana*, 882 P.2d 1366 (Colo. 1994). In so doing, the ICA stated:

> In [*Elmore*,] Elmore pled guilty to rape and aggravated first degree murder of a fourteen-year-old victim. [985 P.2d] at 296 & 299. Elmore appealed, contending, *inter alia*, that the trial court erred in admitting evidence that he had molested the victim when she was five years old. *Id.* . . . at 311. He reasoned that the prior molestation was a separate bad act and had to be evaluated under Rule 404(b). [*Id.*] at 311. The Washington Supreme Court disagreed and held that the prior molestation was part of the *res gestae* of the crimes charged. *Id.* . . . at 311–12. The court reasoned that the victim's threatening to disclose the prior molestation had served in part as a catalyst for her murder and therefore the trial court thought it was proper to allow the admission of the prior molestation to "complete the picture" for the jury. *Id.* . . . at 311–12. The court concluded that such admission was proper under the *res gestae* or "same transaction" exception to Rule 404(b). [*Id.*] at 311. "This exception permits the admission of evidence of other crimes or misconduct where it is a link in the chain of an unbroken sequence of events surrounding the charged offense in order that a complete picture be depicted for the jury." *State v. Acosta*, . . . 123 Wash.App. 424, 98 P.3d 503, 512 (2004) (internal quotation marks, citation, and ellipsis omitted).
>
> The *res gestae* exception to the general Rule 404(b) is also recognized in Michigan. [In *Robinson*,] Robinson was convicted of carrying a concealed weapon. . . . 340 N.W.2d at 304. At trial, the victim testified that Robinson had robbed her of $80

so that he could replace the money he had previously stolen from his employer. *Id.* ... The Court of Appeals of Michigan held the victim's testimony inadmissible. *Id.* ... The court reasoned that[,] while the portion of the victim's testimony involving her robbery by Robinson could have been properly admitted under the *res gestae* exception to the general rule (404(b)), the portion of her testimony as to Robinson's motive for robbing her was wholly irrelevant as Robinson had been charged with carrying a concealed weapon, not robbery. [*Id.*] at 304–05. Michigan courts have defined the *res gestae* exception to Rule 404(b) as that "evidence of prior bad acts [that] is admissible where those acts are so blended or connected with the charged offense that proof of one incidentally involves the other or explains the circumstances of the crime." [*Id.*] at 304 (internal quotation marks, citation, and parentheses omitted; bracketed material added).

Likewise, in [*Pasek*,] the Supreme Court of South Dakota stated that "evidence of 'other acts' may be admissible as *res gestae* evidence, an exception to South Dakota Codified Laws (SDCL) 19–12–5 or Federal Rule 404(b)." ... 691 N.W.2d at 309 n. 7. On June 29, 2003, Pasek escaped from jail in Montana, stole a car, and drove it to South Dakota. *Id.* at 304. On June 30, 2003, Pasek robbed a bank in South Dakota, stole a second vehicle, and proceeded to Indiana, where the authorities later apprehended him. *Id.* A jury convicted Pasek of one count of robbery in the first degree and three counts of grand theft. *Id.* On appeal, Pasek contended the trial court had erred in admitting statements that Pasek made to his friend while they were in the first stolen vehicle about Pasek's plans to rob the bank. *Id.* at 309. According to Pasek, these statements constituted "impermissible other acts evidence." *Id.* at 307 (brackets omitted). The South Dakota Supreme Court disagreed, determining that Pasek's complete criminal transaction began with his escape and auto theft on June 29 and ended with the bank robbery and second auto theft on June 30, and concluding that[,] because Pasek's

statements were immediately antecedent to the main transaction and were helpful in understanding the bank robbery and vehicle thefts, the statements were properly admitted as *res gestae.* *Id.* at 309.

> The *res gestae* embraces matters and statements immediately antecedent to, and having a causal connection with, the main transaction. The *res gestae* as applied to a crime, includes the complete criminal transaction from its beginning or starting point in the act of accused until the end is reached. Continuing acts or a series of events, transpiring before the commission of the crime, and which lead up to and are necessary or helpful to an understanding of the main event, and tend to explain the conduct and purposes of the parties are admissible as part of the *res gestae.*

*Id.*

And, in ... *Quintana,* ... a jury convicted Quintana of, *inter alia,* first degree murder. [882 P.2d] at 1370. Prior to trial, Quintana moved to suppress three statements he had made either during or immediately subsequent to the murder—all of which expressed his desire to kill other persons not involved in the instant murder. *Id.* at 1370 & 1373. The Supreme Court of Colorado concluded that the statements could have been properly admitted as *res gestae* evidence of the crime:

> Evidence of other offenses or acts that is not extrinsic to the offense charged, but rather, is part of the criminal episode or transaction with which the defendant is charged, is admissible to provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred. Such evidence is generally linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. This type of evidence is considered part of the *res gestae* of the offense and it is not subject to the general rule that excludes evidence of prior criminality. *Res gestae* evidence includes the

circumstances, facts and declarations which arise from the main event and serve to illustrate its character. It also includes evidence that is closely related in both time and nature to the charged offense.

*Id.* at 1373 (internal quotation marks, citations, and footnote omitted). The court further emphasized that *res gestae* evidence "is the antithesis of ... Colorado Rules of Evidence [ (CRE) ] 404(b) evidence. Where CRE 404(b) evidence is independent from the charged offense, *res gestae* evidence is linked to the offense." [[17] *Id.*] at 1373 n. 12. The court added that *res gestae* evidence "is admissible only if it is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice." *Id.* at 1374.

*Id.* at 158–59, 157 P.3d at 597–98 (original brackets and ellipsis omitted).[18] Based upon the recognition of the admission of *res gestae* evidence as an exception to Rule 404(b) described by the courts in the aforementioned cases, the ICA again summarized the apartment incident as *res gestae* evidence and admissible under the exception to HRE Rule 404(b):

**17.** The *Quintana* court observed that:
"Other act" evidence ... generally occurs at different times and under different circumstances from the charged offense.... *[C]f. United States v. Williford,* 764 F.2d 1493, 1498 (11th Cir.1985) ("Evidence of an uncharged offense arising from the same series of transactions as that charged is not an extrinsic offense within Rule 404(b)."); *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983) (other act evidence does not fall within the proscription of Rule 404(b) if the evidence is inextricably intertwined with the evidence regarding the charged offense). Indeed, "other" is defined as "different or distinct from that or those referred to or implied; different in nature or kind." Webster's New World Dictionary 1007 (2d College ed.1974).
882 P.2d at 1372 (other citation omitted).

**18.** On application, Fetelee argues that the ICA "glossed over the [aforementioned four cases relied upon by the ICA] and misapplied their holdings." Specifically, Fetelee argues that:
It is unclear which rationale—that set out in *Quintana* or that set out in *Elmore, Robinson,* and *Pasek*—the ICA adopted and why it did so. Thus, the ICA's decision does not provide any guidance on how to apply the exception it adopted. Fetelee's case is, moreover, unlike *Elmore,* where the defendant's prior molesta-

[T]he incident in Lopez's apartment is linked to the crimes charged. Furthermore, the incident is relevant to provide the jury with an explanation as to why Fetelee was so angry and agitated. Fetelee was intoxicated. Fetelee acted violently and irrationally in barging into Lopez's apartment, throwing a fan, punching Freeman, and pursuing Tony. Fetelee's actions were due to the fact that someone had parked and blocked his parking stall. And all this after Lopez had relayed to Fetelee that none of her guests' cars were blocking his parking stall. Fetelee continued to consume alcohol and acted irrationally in grabbing Lincoln's money. These actions are not wholly independent or irrelevant to Fetelee's subsequent unprovoked assault on the two Micronesian men. It is evidence that was necessary to complete the story for the jury.

*Id.* at 159, 157 P.3d at 598.[19]

### c. *arguments before this court*

On application, Fetelee argues, *inter alia,* that "the ICA's definition of *res gestae* and its application of the *res gestae* exception clearly swallowed HRE 404(b)." [20] Fetelee

tion was the catalyst for the crime, and *Robinson,* where the defendant's prior robbery explained how the crime occurred, and *Pasek,* where the defendant's monologue recounted the beginning of his crime spree and his intent to commit the crimes charged, and *Quintana,* where the defendant's statements compelled the acts of a co-defendant and directly countered the defendant's lack of intent defense. It is clear, however, regardless of whether the ICA employed the rationale of *Elmore, Robinson, Pasek,* or that of *Quintana,* the prior incident at the apartment was irrelevant, unrelated, prejudicial, and lacked a legitimate link to the charged offenses.

**19.** The ICA made no mention of Fetelee's argument that the apartment incident was, nevertheless, inadmissible under HRE Rule 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

**20.** Fetelee also maintains that the apartment incident cannot be considered as *res gestae* of the charged offenses. Specifically, Fetelee argues that the apartment incident fails the *Lewis* test inasmuch as there was no nexus between the charged offenses and the apartment incident:
The ... incidents were separate, unrelated, and lacked any nexus to each other. The inci-

further asserts, in his supplemental brief, that the plain language and legislative history of the HRE confirm that the HRE superseded the common law *res gestae* doctrine. According to Fetelee, "the *res gestae* doctrine itself is obsolete to the extent that the various rules comprising the doctrine have not been subsumed in the HRE, and the use of *res gestae* to admit evidence independent of the HRE is unnecessary, harmful, and unconstitutional."

To further support his position that the *res gestae* doctrine should be abandoned, Fetelee points out that, in an analogous situation involving the Hawai'i Penal Code (the Code), both this court and the ICA have held that legislative enactments supersede common law doctrines. Specifically, Fetelee asserts that:

> In *State v. Emerson*, 110 Hawai'i 139, 140, 129 P.3d 1167, 1168 (App.2006), Judge Lim, writing for the ICA, elucidated that the legislature's intent in enacting the Code, similar to the legislature's intent in enacting the HRE, was to "bring uniformity" to the law, and, thus, the legislative enactment overrode a non-Code statute. *Id.* at 143, 129 P.3d at 1171. Likewise, in *State v. Maumalanga*, 90 Hawai'i 58, 976 P.2d 372 (1999) ("*Maumalanga II*"), this court held that there are no common law "considerations" in HRS § 703–302 as "any such common law formulations hav[e] been superseded by the adoption of the [Code]." *See State v. Maumalanga*, 90 Hawai'i 96, 976 P.2d 410 (App.1998) ("*Maumalanga I*") (Acoba, J., concurring and dissenting opinion) (rationale adopted by this court in *Maumalanga II*).

Fetelee further contends that:

> Hawaii case law pre-Code and pre-HRE also supports treating codified statutes as having superseded the common law doctrines. In *Territory v. Alford*, 39 Haw. 460, *4 (1952), the Supreme Court of the Territory of Hawaii held that the statutory law of the territory superseded a common law doctrine. In fact, where there is no

ambiguity in the statute, the statutory text should always control over other sources of authority, such as the common law. *See Welsh v. Campbell*, 41 Haw. 106 (1955) (look to the common law only in instances where there are "no governing provisions of the written law"); *Territory v. Gora*, 37 Haw. 1 (1944) (no need to draw on common law when there is no ambiguity in the statute or in the legislative intent); *cf. Territory v. Scully*, 22 Haw. 618 (1915) (when definition of statute lacking, may look to common law for guidance). If the statute is expressed and the legislative intent is definitive, there is no need to resort to the common law.

Thus, according to Fetelee, because HRE Rule 404(b) is unambiguous, resort to the common law doctrine of *res gestae* to expand or contract the rule's scope is improper. In essence, Fetelee maintains:

> In enacting the HRE, the legislature codified the desired and beneficial principles based on the [FRE], common law, and Hawaii case law. Sen. Stan[d]. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1031. The HRE was intended to be the "singular and primary source" of evidentiary rules. Sen. Stand. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1031. The legislature intended that this single source of evidentiary rules would "promote informed judicial rulings." House Stand. Comm. Rep. No, 721–80, in 1980 House Journal, at 1608. Further, the legislature envisioned that the HRE would result in "uniformity of evidentiary rulings." Sen. Stand. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1029. In sum, the legislature "codif[ied] the law of evidence, to promote informed judicial rulings on evidence points, and to achieve uniformity in the treatment of evidence among the courts of this State." House Stand. Comm. Rep. No. 712–80, in 1980 House Journal, at 1608[.]

(First brackets in original.)

In contrast to Fetelee, the prosecution argues, in its supplemental brief, that *res ges-*

---

dents occurred at different locations—the first in Lopez's apartment, the second on the street. The parties that were involved were completely different—Lopez, her parents, Freeman and Tony were in the apartment, whereas Lincoln,

Hartman, and Alik were on the street. Neither group had any relation or connection to the other. The issues involved in each incident were substantively distinct.

*tae* evidence is "relevant evidence" under HRE Rule 402 and is, therefore, admissible. Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by [law]." In the prosecution's view:

> *Res gestae* evidence is relevant evidence under the HRE. *Res gestae* evidence "is generally linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of a crime, or is necessary to complete the story of the crime for the jury." *People v. Quintana*, 882 P.2d 1366, 1373 (Colo.1994) (citation and internal quotation marks omitted). Such evidence "provides the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred." *Id.* (citations omitted). "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir.1992) (citations omitted).
>
> Therefore, *res gestae* evidence is probative of a witness' credibility. *See State v. Hockings*, 29 Or.App. 139, 562 P.2d 587, 592 (977) ("The believability of a witness is ... as much an issue as the elements of the crime.... Background information is relevant to the issue of the believability of the witness' testimony."); *see also State v. Murphy*, 59 Haw. 1, 9–10, 575 P.2d 448, 455 (1978) ("need for revealing the background circumstances surrounding the witness's association with the defendant was deemed to be crucial in order to establish the witness's believability"). As "the credibility of a witness is always relevant," *State v. Cordeiro*, 99 Hawai'i 390, 422, 56 P.3d 692, 724 (2002), *res gestae* evidence. may be properly admitted under HRE Rule 402.

(Original brackets omitted.)

Furthermore, the prosecution asserts that, although some statements made as part of the *res gestae* may have been subsumed by the "excited utterance" exception to the hearsay rule found in HRE Rule 803(b)(2) (1993),

the ICA correctly concluded that there is a *res gestae* exception to HRE Rule 404(b). The prosecution cites to a number of federal and state cases that expressly recognized that Rule 404(b) does not apply to *res gestae* evidence. For example,

> *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir.2000) (*res gestae* evidence does not implicate FRE Rule 404(b)); *United States v. Baker*, 432 F.3d 1189, 1205 n. 9 (11th Cir.2005) (*res gestae* evidence falls outside scope of FRE [Rule] 404(b)); *United States v. Riebold*, 135 F.3d 1226, 1229 (8th Cir. 1998) (when evidence is admitted under the *res gestae*, FRE Rule 404(b) not implicated)[;] ... *State v. Acosta*, [123 Wash. App. 424,] 98 P.3d 503, 512 (2004) (*res gestae* exception to [Rule] 404(b) permits admission of other crimes or misconduct where it is a link in the chain of an unbroken sequence of events surrounding the charged offense; *State v. Pasek*, 691 N.W.2d 301, 309 n. 7 (S.D.2004) (evidence of "other acts" may be admissible as *res gestae* evidence).

(Original brackets and some internal quotation marks omitted.) The prosecution further observes that other federal courts have similarly acknowledged the viability of the *res gestae* doctrine in holding that FRE Rule 404(b) does not apply to uncharged criminal activity that "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (Quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997) (internal quotation marks and brackets omitted.))

> d. *this court's resolution of the res gestae issue*

The foregoing discussion underscores the need for this court to settle the question whether the *res gestae* doctrine can co-exist with the HRE. We begin with the examination of the purposes underlying the codification of the HRE.

■ As previously stated, the commentary to Rule 100 provides that "[t]he purpose of this chapter is to codify the law of evidence,

to promote informed judicial rulings on evidence points, and to achieve uniformity in the treatment of evidence among the courts of this State." [21] Consistent with this commentary, the legislature expressly recognized—through the adoption of a standing committee report by the Senate Judiciary Committee—that:

> The present need to codify evidentiary rules has come about because of the realization that traditional development of these rules on the case-by-case basis has been found woefully inadequate. Too often, the direction of evidentiary rulings in any given case has depended on the semantic propensities of individual judges. As such, evidentiary rulings have not been uniform, and have been difficult to predict.
>
> The concept of justice presumes that principles of reasoning subsist, which when discovered and uniformly applied, will lead to fair and satisfactory results in resolving different and contending claims of right. By such premise, the fact that in practice some judges will admit certain types of evidence to influence the outcome of trial, while other judges do otherwise, can only erode public confidence in the judicial process. The [HRE] is a concerted effect to correct that flaw.

Sen. Stand. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1030 (internal quotation marks and ellipses omitted). Furthermore, the legislature explained that:

> [T]he [HRE] is ... a very comprehensive compendium of rules that apply to situations in litigation which necessitate evidentiary considerations. It will, as such, afford to practitioners and lay public alike *a singular and primary source* where all evidentiary rules are rationally organized and discussed as they apply to cases litigated in Hawai'i.

*Id.* at 1031 (emphasis added). Given the legislature's articulated intent that the HRE be "a singular and primary source where all evidentiary rules are rationally organized[,]" *i.e.,* that it cover the whole subject on the admissibility of evidence, the legislature has clearly spoken that the HRE supersedes the common law *res gestae* doctrine. *See Kienker v. Bauer,* 110 Hawai'i 97, 109, 129 P.3d 1125, 1137 (2006) ("[W]hen a statute is in derogation of the common law, the intention of the legislature will not be presumed to repeal the common law or a prior statute *unless it clearly appears that the legislature intended to cover the whole subject.*") (emphasis added) (citation omitted).

Analogously, the United States Supreme Court (the Court), in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that the FRE, enacted in 1975, superseded the common law of evidence which, by implication, included "the *Frye* test." *Id.* at 587, 113 S.Ct. 2786. The *Daubert* Court stated:

> The *Frye* test has its origin in a short and citation-free 1923 decision[, *Frye v. United States,* 293 F. 1013 (D.C.1923),] concerning the admissibility of evidence derived from a systolic blood pressure deception test, a crude precursor to the polygraph machine. In what had become a famous (perhaps infamous) passage, the then Court of Appeals for the District of Columbia described the device and its operation and declared:
>
>> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs* [[hereinafter, known as the *Frye* "general acceptance" test]].
>
> ... 293 F. at 1014 (emphasis added).

*Daubert,* 509 U.S. at 585–86, 113 S.Ct. 2786 (internal quotation marks omitted). Stated differently, novel scientific evidence, under *Frye,* was admissible only if it was based on a method or theory that had "gained general

---

**21.** HRE Rule 102.1 (1993) provides that "[t]he commentary to these rules when published may be used as an aid in understanding the rules, but not as evidence of legislative intent."

acceptance" within the field. However, the Court in *Daubert*—like this court here—was faced with the specific challenge as to the continuing authority of the *Frye* "general acceptance" test in the wake of the FRE, which contained the standard for admitting expert testimony in federal trials. *Id.* at 587, 113 S.Ct. 2786.

In rejecting *Frye* and holding that the *Frye* "general acceptance" test was superseded by the adoption of the FRE, the Court observed that, although the common law may serve as an aid in interpreting the FRE, nothing in the drafting history of Rule 702, which governed expert testimony, gave any indication that "general acceptance" is the "absolute prerequisite" for the admission of scientific evidence.[22] *Id.* at 587–88, 113 S.Ct. 2786. The Court further explained that:

> The drafting history makes no mention of *Frye*, and a rigid "general acceptance" requirement would be at odds with the liberal thrust of the [FRE] and [its] general approach of relaxing the traditional barriers to opinion testimony. Given the [FRE's] permissive backdrop and [its] inclusion of a specific rule on expert testimony that does not mention "general acceptance," the assertion that the [FRE] somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the [FRE], should not be applied in federal trials.

*Id.* at 588–89, 113 S.Ct. 2786 (citations, other internal quotation marks, and footnote omitted). The Court, nevertheless, stated that:

> That the *Frye* ["general acceptance"] test was displaced by the [FRE] does not mean, however, that the [FRE itself] place[s] no limits on the admissibility of purportedly scientific evidence. Nor is the

trial judge disabled from screening such evidence. To the contrary, under the [FRE,] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. *Id.* at 589, 113 S.Ct. 2786 (footnote omitted).[23]

In the instant case, we believe that the principles that historically have comprised the *res gestae* doctrine have been codified, but without the use of the words *"res gestae,"* within the HRE. As previously stated, certain concepts contained in the doctrine have been subsumed within the exceptions to the hearsay rules found in HRE Rule 803, such as present sense impressions, excited utterance, and the then-existing mental, emotional, or physical condition. More importantly, there is a specific HRE rule that speaks to the evidence of other crimes, wrongs, or acts. As quoted earlier, Rule 404(b) provides that:

> *Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.* In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

(Emphasis added.) By its plain language, Rule 404(b) generally prohibits the admission of other crimes, wrongs, or acts, which negatively impacts a defendant's character or shows propensity to commit a crime. Evi-

---

**22.** FRE Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**23.** The Court summarized its holding as follows:

"General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the [FRE], but the [FRE]—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.
*Id.* at 597, 113 S.Ct. 2786.

dence of other crimes, wrongs, or acts may, however, be admissible for other purposes when relevant to an issue in a case, *e.g.*, to show "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." HRE Rule 404(b). In other words, because the legislative history and HRE Rule 404(b) itself make no mention of evidence of other criminal activity that becomes part of the history of the event on trial, *i.e.*, the *res gestae* evidence, the admission of such evidence "would be at odds," *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786, with the legislative purpose of establishing the HRE as "a singular and primary source where all evidentiary rules are rationally organized[.]" Sen. Stand. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1031. We, therefore, conclude that the *res gestae* doctrine is no longer a legitimate independent ground for admissibility of evidence in Hawaiʻi inasmuch as the it is superseded by the adoption of the HRE. Accordingly, we are in accord with courts that have retired the term "res gestae" from the language of the law of evidence because it is no longer useful and tends only to confuse the reasoning with respect to why a given evidence should be admissible.[24] We are convinced by the rationale of other courts and commentators, suggesting that the better practice is to analyze admissibility under the specific rule of evidence that applies to the particular factual situation presented.[25]

We are not persuaded by other courts that have implicitly recognized the doctrine under the guise of intrinsic/extrinsic evidence and the "inextricably intertwined" factor. In our view, these expressions are troublesome in that they essentially nullify Rule 404(b)'s re-

strictions on "bad act" evidence. Indeed, as previously quoted and worth repeating here, the *Bowie* court criticized the aforementioned formulation, stating:

> Some are circular: inextricably intertwined evidence is intrinsic, and evidence is intrinsic if it is inextricably intertwined. Others are over-broad. The "complete the story" definition of "inextricably intertwined" threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could "complete the story" or "incidentally involve" the charged offense, or "explain the circumstances." If the prosecution's evidence did not "explain" or "incidentally involve" the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant. *See* [FRE Rules] 401 and 402.

232 F.3d at 928.

In light of the above discussion, we hold that the *res gestae* doctrine is no longer viable in this jurisdiction and shall not be used or recognized as an independent basis for the admission of evidence. As such, we must now determine whether the apartment incident in this case would nevertheless have been admissible under HRE Rule 404(b), thereby rendering the ICA's ultimate conclusion to uphold the trial court's August 3, 2005 judgment of conviction and sentence proper.

e. *application of HRE Rule 404(b)*

As previously stated, Rule 404(b) prohibits the use of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show that he acted in

24. We note that the prosecution's argument that *res gestae* evidence is "relevant evidence" under HRE Rule 402 and, thus, is admissible is without merit. In *Gunby*, the Kansas Supreme Court specifically explained that:

> [M]ere relevance is not an adequate reason to bypass rules of exclusion. K.S.A. 60-407 states that "all relevant evidence is admissible" except that evidence which is excluded under a statute. *The doctrine of res gestae is not only an improper basis for circumventing the exclusion of hearsay evidence; it does not provide a basis for circumventing K.S.A. 60-455 [ (governing the admissibility of other crimes or civil wrongs) ].*

144 P.3d at 662 (emphases added). As such, the *Gunby* court declared that "[t]he concept of *res gestae* is dead as an independent basis for admissibility of evidence in Kansas. *That evidence may be part of the res gestae of a crime demonstrates relevance. But that relevance must still be measured against any applicable exclusionary rules.*" *Id.* at 663 (emphasis added).

25. We note, however, that compliance with Rule 404(b) does not itself assure admission of the other crimes evidence; evidence may be excluded on the basis that "its probative value is substantially outweighed by the danger of unfair prejudice[.]" HRE Rule 403.

conformity therewith." In excluding character evidence under Rule 404,

> the legislature recognized the inherent danger of such evidence: " 'Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion.' " HRE [Rule] 404, Commentary (quoting [FRE Rule] 404 advisory committee's note).
>
> In enacting subsection (b), the legislature specifically sought to preclude the admission of evidence of specific instances of conduct "when the only relevance is in the two-step inference from 'other' conduct to general character and then 'to show that he acted in conformity therewith' on the occasion in question." HRE [Rule] 404, Commentary.

*State v. Pemberton,* 71 Haw. 466, 471–72, 796 P.2d 80, 83 (1990). Under subsection (b), however, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." *See State v. Clark,* 83 Hawai'i 289, 300, 926 P.2d 194, 205 (1996) ("The list of permissible purposes in Rule 404(b) is not intended to be exhaustive for the range of relevancy outside the ban is almost infinite." (Internal quotation marks and citation omitted.)).[26] Evidence deemed admissible under Rule 404(b) would nevertheless be excluded

> if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

HRE Rule 403. In other words, the trial court must

> first determine if the evidence of other crimes, wrongs or acts is relevant and "probative of any other fact that is of consequence to the determination of the action, such as motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." HRE [Rule] 404(b). [27] If such evidence is determined to be relevant, the court must then balance the probative value of the evidence against its prejudicial impact. HRE [Rule] 403.

*State v. Renon,* 73 Haw. 23, 32, 828 P.2d 1266, 1270 (1992) (footnote omitted).

Here, the trial court, in addition to finding that the apartment incident constituted *res gestae* evidence, also ruled that:

> Though the *[apartment] incident* does not constitute a prior bad act, it is noted that its relevance *does include an explanation of [Fetelee]'s motive, that is, to manifest the anger he continued to experience as a result of the incident in Ms. Lopez's apartment.* With respect to [HRE] Rule 403, while the evidence is admittedly prejudicial, it is of significant probative value to core matters of proof required by the prosecution.

*Fetelee,* 114 Hawai'i at 154, 157 P.3d at 593 (emphases added). In his application, Fetelee asserts—as he did before the ICA—that evidence relating to the apartment incident was neither relevant nor probative to the underlying charges. Specifically, Fetelee argues that the apartment incident

> did not illustrate Fetelee's intent, did not counter Fetelee's defense, and was not

---

**26.** Indeed, as this court stated:

> Rule 404(b) was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence. Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a person who commits a crime probably had a defect of character; a person with a defect of character is more likely than people generally to have committed the act in question. In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a

proper purpose so long as the evidence is not offered *solely* to prove character.

*Clark,* 83 Hawai'i at 301, 926 P.2d at 206 (original brackets, *internal quotation marks, and citation omitted*) (emphases in original).

**27.** Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401. Moreover, "[a]ll relevant evidence is admissible, except as otherwise provided by ... these rules[.]" HRE Rule 402 (1993).

necessary for the jury to reach a determination of the theft or assault charges. The only purpose of the evidence was to improperly convey that Fetelee was a person prone to violent bursts of anger, which is specifically prohibited under HRE [Rule] 404(b) and also under HRE 403.

The prosecution, however, maintained in its answering brief that:

> Evidence that [Fetelee] was angry, drunk, and violent just before coming into contact with Lincoln, Hartman, and Alik was relevant to show [Fetelee]'s *state of mind, motive, and intent.* Evidence of the incident was also necessary to aid the jury to understand the context in which the crime occurred and to refute [Fetelee]'s claims of self-defense and lack of intent. The evidence explained why [Fetelee] would pick a fight with two complete strangers for no apparent reason, knocking one of them unconscious and kicking him in the head while he lay on the ground before running to his apartment to get a knife to stab the other. As such, the evidence was relevant to show that [Fetelee] had intentionally engaged in conduct which was a substantial step in a course of conduct which was intended or know to cause the death of Alik and substantial bodily injury of Hartman.

(Emphases added.)

This court has previously declared that "[i]ntent refers to the state of mind with which an act is done or omitted, *Black's Law Dictionary* 810 (6th ed.1990), and differs from most of the other [Rule] 404(b) excep-

tions because it is an ultimate issue in the case." *Renon,* 73 Haw. at 36, 828 P.2d at 1272 (other citation omitted). Consequently, we review the prosecution's contention regarding the admissibility of the apartment incident evidence on two—not three—grounds, *i.e.,* intent (which is the state of mind) and motive.

### i. intent

"[P]roof of the required mental element of the offenses charged[, *i.e.,* intent,] is admissible because it does not require an inference as to the character of the accused or as to his conduct." [28] *Id.* at 36–37, 828 P.2d at 1272–73 (internal quotation marks, citation, and original footnote omitted). In this case, the prosecution-having charged Fetelee with attempted murder in the second degree, attempted assault in the second degree, and theft in the second degree-had the burden to prove that Fetelee intentionally attempted to murder Alik, intentionally attempted to assault Hartman, and intentionally obtained or exerted unauthorized control over Lincoln's ten dollars. Fetelee testified that Alik was stabbed with his own knife during Fetelee's struggle with Alik and that he punched Hartman because he believed that Hartman was going to punch him. In other words, Fetelee maintained that he acted in self-defense, thereby placing his intent in issue. Fetelee also denied taking any money from Lincoln, despite Lincoln's account.

The prosecution—as permitted by the trial court—adduced testimony from Lo-

---

28. As previously stated, Fetelee was charged with attempted murder in the second degree, attempted assault in the second degree, and theft in the second degree. Pursuant to HRS § 705–500(1),

> [a] person is guilty of an attempt to commit a crime if the person:
> (a) *Intentionally engages* in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
> (b) *Intentionally engages* in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

(Emphases added.) Moreover, "[a] person commits the offense of theft in the second degree if the person commits theft," *inter alia,* "[o]f property from the person of another" or "[o]f property or services the value of which exceeds $300." HRS § 708–831(1)(a)–(b). In turn, a person commits theft if the person "[o]btains or exerts unauthorized control over property. A person obtains, or exerts control over, the property of another *with intent to deprive* the other of the property." HRS § 708–830(1) (emphasis added). Fetelee was convicted of the first two offenses, as charged; however, he was convicted of theft in the *fourth degree*—rather than second degree. Theft in the fourth degree requires that "the person commits theft of property or services of any value not in excess of $100." HRS § 708–833.

pez and Freeman regarding the apartment incident, including Fetelee's argument with Lopez, the damage to Lopez's property, and Fetelee's actions toward Freeman and Tony. Inasmuch as Fetelee was not charged with any criminal offense arising from the apartment incident, the evidence of his conduct related thereto constitutes "other crimes, wrongs, or acts." HRE Rule 404(b). Thus, under a Rule 404(b) analysis, the question is whether evidence of the apartment incident was relevant to demonstrate Fetelee's intent to commit the charged offenses. We answer in the negative.

Federal courts have announced that, if other crimes, wrongs, or acts are used to prove intent, "the prior act must be similar to the offense charged." *United States v. Hadley*, 918 F.2d 848, 851 (9th Cir.1990) (citation omitted); *see also United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir.2004) (holding that the prior incident of importing and possessing marijuana was relevant to show that defendant "engaged in purposeful and repetitive criminal behavior and was not . . . an innocent victim who was forced to smuggle drugs the first time and tricked into smuggling drugs the second time"); *United States v. Basinger*, 60 F.3d 1400, 1408 (9th Cir.1995) (holding that defendant's "previous possession of red phosphorous, especially in conjunction with his possession of methamphetamine, bears a sufficient factual similarity to the instant charges (manufacturing and maintaining a place to manufacture methamphetamine using the red phosphorous method)" to show that defendant intended to manufacture methamphetamine and intended to use the site for such purpose). *But see State v. Pinero*, 70 Haw. 509, 517–18, 778 P.2d 704, 710–11 (1989) (in a case where a police officer was shot and killed during a struggle with defendant who had grabbed the officer's gun, this court held that the admission of evidence regarding a prior incident involving defendant's attempt to grab a police officer's revolver was an abuse of discretion because the need for the evidence of the prior event was not great where other evidence in the case at bar established that defendant had the officer's gun in his hand and where the probability of the jury's hos-

tile reaction against defendant outweighed any probative value).

Here, the event that transpired in Lopez's apartment regarding the parking stall was completely separate and distinct from the incidents leading up to Fetelee's attempted murder, attempted assault, and theft charges. At the apartment, Fetelee and Lopez argued about a van in the parking lot blocking his parking space. In contrast, Fetelee initially approached Lincoln for a cigarette and, thereafter, approached the two Micronesian men because he believed they had harassed his then-girlfriend. It is inconceivable how the apartment incident would be relevant to Fetelee's intent in attempting to murder Alik and assault Hartman, or his intent to deprive Lincoln of her money. The similarities between Fetelee's conduct in Lopez's apartment and his conduct as it relates to the attempted murder of Alik, attempted assault of Hartman, and theft against Lincoln are lacking. *See State v. Alsanea*, 138 Idaho 733, 69 P.3d 153, 159–60 (Ct.App.2003) (holding that the defendant's prior bad acts of stalking and harassing his girlfriend were not relevant to the defendant's intent to commit the aggravated assaults against the police officers inasmuch as these two acts were not similar). Accordingly, we believe that evidence of the apartment incident was not sufficiently similar to be probative of Fetelee's intent to commit the charged offenses.

### ii. motive

■ "Unlike intent, motive is not an ultimate issue. However, evidence of motive is admissible to prove the state of mind that prompts a person to act in a particular way; an incentive for certain volitional activity. Thus, proof of motive may be relevant in tending to refute or support the presumption of innocence." *Renon*, 73 Haw. at 37, 828 P.2d at 1273 (internal quotation marks and citations omitted). In *Renon*, one defendant (Efren Renon) was charged with and convicted of attempted murder in the first degree, murder in the second degree, and carrying a firearm on his person without a license; the second defendant (Renato Paet) was convicted of the offense of accomplice to murder in the second degree. *Id.* at 24–25, 828 P.2d at

1267. The charges and convictions against the defendants arose out of a shooting incident in the parking lot of Farrington High School, resulting in the death of Gilbert Asuncion. "Escalating hostilities between two rival youth gangs, the Hawaii Brothers and the Judas, was allegedly the reason for the shooting." *Id.* The defendants were members of the Hawaii Brothers gang; Asuncion was a member of the Judas gang. *Id.* at 25–26, 828 P.2d at 1267.

On appeal, the defendants contended that a prior shooting incident, which had occurred twenty-four hours before the Farrington shooting, should not have been presented to the jury. *Id.* at 25, 828 P.2d at 1267. The prior incident involved

> several members of the Judas gang, including Asuncion, [who] were playing basketball at Mokauea Mini Park in Kalihi. Paet and other Hawaii Brothers gang members . . . drove by the Mini Park. [One of the Hawaii Brothers gang members] fired a shot at a Judas gang member who was in the park. [The] shot missed the gang member, but hit and wounded an elderly woman [[hereinafter, the Mini Park shooting]].

*Id.* at 26, 828 P.2d at 1267–68. This court held that "evidence of the Mini Park shooting was relevant to show that [the defendants] were knowing participants in an uncharged conspiracy to kill Judas gang members, a plan which was motivated by a desire for revenge due to ongoing hostilities between the two gangs." *Id.* at 36, 828 P.2d at 1272. In so holding, this court explained that:

> The descriptions of the Mini Park and Farrington shootings were similar in that participants were from the same two gangs and the same weapon was used in both incidents. Also, the Mini Park shooting incident occurred within twenty-four hours of the Farrington shooting. Evidence of the Mini Park shooting was necessary and crucial to bridge the . . . Mini Park . . . incident[ ] with the Farrington shooting to show the uncharged conspiracy and the intent and motive of the defendants. *Because a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect.*

*Id.* at 38, 828 P.2d at 1273–74 (internal quotation marks, brackets, and citation omitted) (emphasis added).

 The instant case, however, is clearly distinguishable. Unlike *Renon*, the apartment incident evidence could not have illustrated Fetelee's motive in committing the charged offenses when such evidence was separate and distinct from the charged offenses, as discussed above. The apartment incident and the incidents giving rise to the charged offenses were unrelated and lacked any nexus to each other. The parties involved were completely different—Lopez, Freeman, and Tony were involved in the apartment incident, whereas Lincoln, Hartman, and Alik were involved in the incidents that resulted in the charges against Fetelee. Neither group had any relation or connection to the other; the issues involved in each incident were substantively distinct. Accordingly, we believe that the apartment incident was not relevant to prove Fetelee's motive to commit the charged offenses.

However, the prosecution submits that the apartment incident evidence was relevant to show, *inter alia,* Fetelee's motive inasmuch as Fetelee "was angry, drunk, and violent just before coming into contact with Lincoln, Hartman, and Alik." Clearly, the prosecution premises its argument solely upon the belief that Fetelee's emotional state remained the same from the apartment until his confrontation with Lincoln and the Micronesian men, thereby establishing the requisite nexus to render the evidence of the apartment incident relevant. This premise, however, is questionable inasmuch as Lopez testified that Fetelee returned about ten minutes after the incident at the apartment and appeared calm and apologetic. Further, under its argument, the prosecution clearly attempted to admit the apartment incident evidence to demonstrate Fetelee's propensity towards anger and provoking fights. We agree with Fetelee that the apartment incident evidence "not only had the possibility, but there was a likelihood, of the jury inferring that Fetelee was a violent person of bad character."

In an analogous situation, this court, in *State v. Pemberton,* 71 Haw. 466, 796 P.2d 80 (1990), held that it was error to admit charac-

ter evidence purportedly probative of the defendant's state of mind. *Id.* at 473, 796 P.2d at 83. In that case, the defendant and two men were involved in an altercation outside a nightclub, during which altercation the defendant pulled out a knife and stabbed both men. *Id.* at 467–68, 796 P.2d at 81. Consequently, the defendant was charged and convicted of two counts of assault in the second degree and one count of carrying a deadly weapon. *Id.* at 467, 796 P.2d at 81. The defendant appealed his conviction, specifically challenging the trial court's decision to allow testimony concerning a prior incident in which the defendant allegedly use a knife. *Id.* The prosecution, however, contended that the evidence was "highly probative of [the d]efendant's state of mind and rebut[ted the d]efendant's claim of self-defense." *Id.* at 472, 796 P.2d at 83. This court concluded that:

> [U]nder HRE [Rules] 404(b) and 403, [the evidence] that [the d]efendant had previously provoked a fight using a knife, was clearly inadmissible as it was not relevant for any purpose permissible under [Rule] 404(b) and could only prejudice [the d]efendant by showing [the d]efendant's propensity towards provoking fights with a knife: the very inference Rule 404 was meant to prohibit.

*Id.* at 473, 796 P.2d at 83. Likewise, the apartment incident evidence clearly would not fall within the permissible purposes of Rule 404(b) and would merely demonstrate Fetelee's propensity towards anger and provoking fights. Accordingly, we believe that nothing that occurred in Lopez's apartment had any tendency to make the existence of any fact of consequence to the determination of the underlying criminal charges more or less probable than it would be without the evidence.[29]

In light of the aforementioned conclusion and the fact that this case turns on credibility of Fetelee, Clark, Hartman, and Alik, we cannot say the trial court's admission of the evidence was harmless beyond a reasonable doubt. *State v. Mattiello*, 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999) ("It is well-

settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." (Internal quotation marks, citation, and original brackets omitted.)).

### B. *Fetelee's Remaining Contentions*

Fetelee also challenges the ICA's holdings that (1) the trial court properly allowed the prosecution to reopen its case-in-chief to present evidence of the apartment incident and (2) the trial court's failure to instruct the jury with a limiting instruction "prior to Lopez's or Freeman's testimony regarding the [apartment incident]" did not constitute error. However, in light of our holdings that the *res gestae* doctrine should not be used or recognized as an independent basis for the admission of evidence and that the apartment incident was not relevant to the underlying charges and, therefore, was inadmissible under HRE Rule 404(b), we need not address the instant issues.

### IV. CONCLUSION

Based on the foregoing, we hold that the use of *"res gestae"* as an independent basis for the admission of evidence should be abandoned in the wake of Hawaii's well-developed and long-standing rules of evidence. We further hold that, under the HRE Rule 404(b) analysis, the apartment incident evidence does not fall within the permissible purposes of Rule 404(b) to render the evidence relevant and admissible. Accordingly, in light of our holdings, we are compelled to vacate the ICA's May 17, 2007 judgment on appeal and the trial court's August 3, 2005 judgment of conviction and sentence, and remand the case to the trial court for a new trial consistent with this opinion.

NAKAYAMA, J., concurring separately.

Concurring Opinion by NAKAYAMA, J.

I respectfully concur in the result. Because the legislature intended that the Hawai'i Rules of Evidence ("HRE") serve as "a singular and primary source" for evidentiary

---

**29.** In light of our conclusion that the apartment incident evidence is not relevant to the charged offenses, we need not conduct a Rule 403 balancing test.

rules, I agree that the ICA gravely erred by acknowledging the *res gestae* doctrine, inasmuch as the HRE supersedes the common law *res gestae* doctrine. *See* majority at 77–79, 175 P.3d at 733–35. However, I write separately to emphasize the value and potential viability of *res gestae* evidence, as numerous federal courts that continue to rely on this doctrine have demonstrated.

## A. The Continuing Importance of the *Res Gestae* Doctrine

As the majority explained, the *res gestae* doctrine historically admitted "otherwise inadmissible evidence" "to permit each witness to tell his or her story in a natural way ... [and in] recognition of spontaneity as the source of special trustworthiness." Majority at 63, 175 P.3d at 719 (quoting 2 Kenneth S. Broun, *McCormick on Evidence* § 268 at 245–46 (6th ed.2006)). Allowing the development of the full story is critical at trial:

> It may be quite impossible to prove the case without revealing other crimes. The court cannot 'fragmentize the event under inquiry.' If an understanding of the event in question, or if a description of the immediate circumstances reveals other crimes than those charged, exclusion will lead to a highly artificial situation at the trial making understandable testimony unlikely.

*United States v. Krezdorn*, 639 F.2d 1327, 1332 (5th Cir.1981) (footnotes and citation omitted). After all, "[t]here is no reason to treat events minutes before the accident as part of a separate occurrence from the accident." *Moody ex rel. Moody v. Ford Motor Co.*, No. 03–CV–0784–CVE–PJC, 2006 WL 3325425, at *4 (N.D.Okla. Nov.14, 2006) (holding that evidence of a driver's speed prior to the accident is admissible because driver's "conduct during the time leading up to the accident is part of one event"). Moreover, background evidence

> has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an

integral part of a witness's testimony, or completes the story of the charged offense. *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir.2000) (citing Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence*, 42 U. Miami Law Review 947 (March/May 1998)).

Bad acts are admissible as *res gestae* evidence "to show the context of the crime when the bad acts are 'so intimately connected with and explanatory of the crime charged against the defendant and [are] so much a part of the setting of the case and its environment that [their] proof is appropriate in order to complete the story of the crime on trial.'" *United States v. Powers*, 59 F.3d 1460, 1466 (4th Cir.1995)(holding that evidence of defendant's prior acts of physical acts against the victim is admissible in the trial of his charge of sexual abuse of a minor to show the defendant's control and victim's "inability to resist or report his violent acts"). *See Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir.1993) (citing *State v. Edwards*, 406 So.2d 1331, 1351 (1981)) (holding that detailed evidence of defendant's criminal activity on the night of the alleged murder (stealing wine from a grocery store and attempting to steal the victim's car) is admissible in defendant's trial for murder because the murder "did not occur in a vacuum").

Accordingly, this court has supported the admission of the defendant's prior bad act as *res gestae* evidence. *See* majority at 64–65, 175 P.3d at 720–21 ("*Territory v. Warren*, 35 Haw. 232, 238–39 (1939) (in prosecuting for killing of a police officer, evidence that the defendant was operating house of prostitution admissible as *res gestae* )); *Territory v. Wilson*, 26 Haw. 360, 361 (1922) (evidence of similar crime committed at the same time and same place admissible as *res gestae* "; *Republic v. Tsunikichi*, 11 Haw. 341 (1898)). In *Tsunikichi*, we affirmed the trial court's admission of evidence that the defendant killed his child before killing his wife under the *res gestae* doctrine. *Tsunikichi*, 11 Haw. at 344. We explained that this evidence "was a fact connected with the [charge] and forms part of one transaction and illustrates its character and by reason and upon authority

it could not be properly excluded." *Id.* Under the same rationale and laws, in the instant case, the evidence regarding defendant's confrontation in the apartment may have been admissible under the *res gestae* doctrine.[1]

In light of the usefulness of the *res gestae* doctrine, many Federal courts, including the Fifth, Sixth, and Ninth Circuit, continue to admit *res gestae* evidence, even after adopting FRE Rule 404(b) (the nearly identical counterpart of HRE Rule 404(b)) in 1975. *See* majority at 68, 175 P.3d at 724 (citing *Hardy*, 228 F.3d at 748 (explaining that *res gestae* evidence "does not implicate Rule 404(b)"), *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir.1992) ("[E]vidence concerning other acts that are inextricably intertwined with the charged acts may be admitted."), and *United States v. McDaniel*, 574 F.2d 1224, 1227 (5th Cir.1978) ("Evidence of other crimes, closely related in time and nature to the crime charged, may be admitted to establish the *res gestae*, that is, the common scheme or history of the crime, of which the other crimes constitute a part.")). *See also United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997) ("It is well established that "evidence of uncharged criminal activity is not considered 'other crimes' evidence under [FRE] 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'" (citations omitted)). *But see* majority at 67, 175 P.3d at 723 ("observing that, for purposes of [FRE], the use of the term *res gestae* 'is essentially obsolete'" (citing *Stephens v. Miller*, 13 F.3d 998, 1003 (7th Cir. 1994))). Further, "courts [including the Fifth, Eighth, Tenth, and Eleventh Circuit,] that have not expressly recognized the *res*

*gestae* doctrine implicitly acknowledged its continued viability via the application of its underlying concept." Majority at 67, 175 P.3d at 723. *See* majority at 67–68, 175 P.3d at 723–24 (citing *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983), *United States v. Green*, 175 F.3d 822, 831 (10th Cir.1999), *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir.2006), *United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990), and *Krezdorn*, 639 F.2d at 1332). The federal reliance of the *res gestae* doctrine in spite of the adoption of the FRE highlights this doctrine's present-day usefulness and continuing support.

## B. Rejection of the *Res Gestae* Criticism

The majority observes that *res gestae* doctrine has been criticized for being (1) vague inasmuch as courts have ignored the traditional limitations and broadened the usage of this doctrine, (2) "harmful because, by its ambiguity, it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both," and (3) "useless because every rule of evidence to which it has ever been applied exists as part of some other well-established principle and can be explained in the terms of that principle." Majority at 67, 175 P.3d at 723 (citing 2 Broun, *McCormick on Evidence*, § 269 at 246; quoting 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1767 at 253 (Chadbourn rev.1976)). However, I do not believe that these arguments are persuasive.

*Res gestae* evidence is not unlimited. Rather, the doctrine admits background evidence which "consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*,

---

1. In the present case, the events that occurred immediately prior to the incident in question consisted as part of a larger occurrence and was therefore *res gestae* evidence. As the ICA opined,

In total, Fetelee was agitated when he arrived home to find his parking stall blocked and his agitation, coupled with his intoxication, continued throughout the course of the early morning. The incident in Lopez's apartment, the exchange with Lincoln, and the unprovoked assault on the two Micronesian men were reasonably contemporaneous with one another....

These actions are not wholly independent or irrelevant to Fetelee's subsequent unprovoked assault on the two Micronesian men. It is evidence that was necessary to complete the story for the jury.

*State v. Fetelee*, 114 Hawai'i 151, 157, 159, 157 P.3d 590, 596, 598 (App.2007).

228 F.3d 745, 748 (6th Cir.2000). *See United States v. Hinojosa*, No. 1:06–cr–093, 2007 WL 3347878, at *2 (W.D.Mich. Nov.7, 2007) ("The required connection between *res gestae* evidence and the charged offense imposes severe limitations on the admission of background evidence and, when properly analyzed, is not an open ended invitation to admit any evidence of a prior bad act."). *See also* majority at 65–66, 175 P.3d at 721–22 (citing *Territory of Hawai'i v. Lewis*, 39 Haw. 635 (1953) (defining and limiting the application of *res gestae* )).

In addition, the trial court must determine whether the evidence conforms with HRE Rule 403, which excludes evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Thus, while the *res gestae* evidence may be prejudicial against the defendant, it will *not* be admitted if the unfair prejudice substantially outweighs the probative value of the evidence. Admittedly, these limitations give the trial court discretion regarding the admission of the evidence. However, the trial court is often required to make a "judgment call" when determining the admissibility of evidence. *See* HRE Rule 403;[2] HRE Rule 404(b);[3] HRE Rule 803(24);[4] *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814

(1996) ("The traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court"). In the same way, because the HRE cannot account for every situation, it is appropriate that the trial court has discretion to determine whether to admit *res gestae* evidence according to the facts of the case.

Accordingly, the *res gestae* doctrine alongside HRE Rule 404 would not create ambiguity or uncertainty. HRE Rule 404 excludes most types of character evidence because, as the legislature recognized, it is "of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion." *State v. Pemberton*, 71 Haw. 466, 471–72, 796 P.2d 80, 83 (1990) (quoting HRE Rule 404, Commentary (quoting [Federal Rules of Evidence ("FRE") ] Rule 404 advisory committee's note)). HRE Rule 404(b), an "inclusionary rule," admits evidence " 'only when it proves nothing but the defendant's criminal propensities,' " and conforms with Rule 403. *United States v. Hadley*, 918 F.2d 848, 850 (9th Cir.1990) (citations omitted). However, because *res gestae* evidence must pass through the portals of HRE Rule 403, *res gestae* evidence would not be unfairly prejudicial in contradiction of the purpose or policy of HRE Rule 404(b).[5] *See Krezdorn*, 639 F.2d at 1332 ("It

---

**2.** HRE Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**3.** HRE Rule 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and

general nature of any such evidence it intends to introduce at trial.

*See Hadley*, 918 F.2d at 850 (explaining that the district judge has "wide discretion" when determining whether evidence is admissible under HRE Rule 404(b)).

**4.** HRE Rule 803(24) provides in pertinent part:

A statement not specifically covered by any of the exceptions in this paragraph (b) but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

**5.** Although HRE Rule 404(b) is not implicated when evidence is admitted under *res gestae, see United States v. Riebold*, 135 F.3d 1226, 1229

matters little whether the evidence is viewed as lying beyond the scope of Rule 404, or as satisfying the test of Rule 404(b) since *it is being used to enhance the trier's understanding of the event, and not to prove propensity.*" (citation omitted) (emphasis added)).

### C. *Res Gestae* Doctrine In the Wake of the HRE

Although I join the majority in its holding that the HRE supersedes the *res gestae* doctrine, I do not believe that the common law is antiquated. *See United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). In *Abel,* the United States Supreme Court discussed the role of common law in light of the enactment of the FRE, as follows:

> In principle, under the Federal Rules no common law of evidence remains. 'All relevant evidence is admissible, except as otherwise provided....' In reality, of course, *the body of common law knowledge continues to exist,* though in the somewhat altered form of a source of guidance in the exercise of delegated powers.

*Id.* at 51, 105 S.Ct. 465 (quoting Cleary, *Preliminary Notes on Reading the Rules of Evidence,* 57 Neb. L.Rev. 908, 915 (1978)). Thus, I believe that the *res gestae* doctrine remains valuable, but

(1998), because the application of the facts under HRE Rule 404(b) and *the res gestae* doctrine may produce two results, it is important that the

we are not at liberty to interpret a statutory provision to further a policy that is not articulated in either the language of the statute or the relevant legislative history, even if we believe that such an interpretation would produce a more beneficent result, for 'the Court's function in the application and interpretation of such laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out.'

*Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 467, 879 P.2d 1037, 1050 (1994) (Klein, J., concurring and dissenting) (quoting *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 256–57, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (Black, J., dissenting)). For this reason, I write separately to emphasize the ongoing importance of the *res gestae* doctrine, but I must concur in the majority's result.

result under one rule does not conflict with the purpose or policy of the other.